# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **WASHINGTON METROPOLITAN** | * | |
| **AREA TRANSIT AUTHORITY** | * | |
| | * | |
| Petitioner | * | |
| | * | |
| v. | * | Civil No. **PJM 09-3030** |
| | * | |
| **LOCAL 689, AMALGAMATED** | * | |
| **TRANSIT UNION** | * | |
| | * | |
| Respondent | * | |

## OPINION

This action concerns the validity of an arbitration award issued by a three-person Board of Arbitration ("Board") convened for the purpose of arbitrating a collective bargaining dispute between Petitioner Washington Metropolitan Area Transit Authority ("WMATA" or the "Authority") and Respondent Local 689 of the Amalgamated Transit Union ("Local 689" or the "Union"). It presents a question of first impression in this or any court—namely, the extent to which the federal National Capital Area Interest Arbitration Standards Act ("Standards Act" or "Act"), 40 U.S.C. §§ 18301-18304, abrogates the law of arbitration as it applies to certain labor disputes involving interstate compact agencies operating in the national capital area.

For the following reasons, WMATA's Renewed Motion for Summary Judgment [Paper No. 36] is **DENIED WITHOUT PREJUDICE**. The Union's Renewed Motion for Summary Judgment [Paper No. 38] is also **DENIED WITHOUT PREJUDICE**. WMATA's Motion for an Order Requiring the Submission of the Entire Record [Paper No. 45] is **GRANTED**. In addition, the Court **DIRECTS** the Board and its Neutral Chairman, Richard R. Kasher, to render a Second—and *final*—Supplemental Opinion demonstrating the extent to which the Board has

fully complied with the requirements of the Standards Act, as interpreted and applied by the Court in this Opinion.[1]

<h1 style="text-align:center">I.</h1>

The facts and procedural background of this case are these:

WMATA is a corporate and political subdivision of the District of Columbia and the states of Maryland and Virginia. The Authority was formed in 1967 pursuant to an interstate compact among its three governing jurisdictions for the purposes of planning, developing, building, financing, and operating a mass public transportation system in the Washington, D.C. metropolitan area. *See* D.C. Code § 9-1107.01 (adopting the Washington Metropolitan Area Transit Authority Compact ("Compact") for the District of Columbia); Md. Code Ann., Transp. § 10-204 (adopting the Compact for the state of Maryland); Va. Code. Ann. §§ 56-529, 56-530 (adopting the Compact for the state of Virginia). Today WMATA operates the second largest rail transit system and the sixth largest bus network in the United States. *See* Metro Facts, http://www.wmata.com/about_metro/docs/metrofacts.pdf (last visited Feb. 16, 2011). The Authority serves a population of approximately 3.5 million people across a geographic area spanning some 1,500 square miles.[2] *See id.*

Pursuant to the Compact, WMATA's operating expenses are to be borne, "as far as possible, . . . by the persons using or benefiting from the Authority's facilities and services," with any remaining costs to be equitably shared by the signatory jurisdictions "by agreement among

---

[1] Portions of this Opinion were previously delivered in oral rulings from the bench following oral argument. The Court's oral rulings are incorporated into this written Opinion. To the extent that there may be any inconsistencies between the Court's prior oral decisions and this written Opinion, the written Opinion shall be deemed controlling.

[2] The Compact defines the geographic area in which WMATA operates—the "Washington Metropolitan Area Transit Zone"—as: "[T]he District of Columbia, the cities of Alexandria, Falls Church, and Fairfax, and the counties of Arlington, Fairfax, and Loudoun and political subdivisions of the Commonwealth of Virginia located within those counties, and the counties of Montgomery and Prince George's in the State of Maryland and political subdivisions of the State of Maryland located in said counties." Md. Code Ann., Transp. § 10-204.

them." Md. Code Ann., Transp. § 10-204. According to statistics provided by the Authority during the underlying arbitration, fares and other revenue currently fund approximately 57.6 percent of daily operating expenses, while funds provided by the signatory jurisdictions cover the remaining 42.4 percent. *See* Metro Facts, *supra*.

Local 689 is a labor union that represents some 7,700 WMATA employees, who comprise approximately 70 percent of the current WMATA workforce. As required by the Compact, WMATA collectively bargains with the Union "concerning wages, salaries, hours, working conditions, and pension or retirement provisions." Md. Code Ann., Transp. § 10-204. When collective bargaining fails to resolve a labor dispute between WMATA and the Union, the Compact requires that the dispute be submitted "to arbitration by a board composed of three persons, one appointed by the Authority, one appointed by the labor organization representing the employees, and a third member to be agreed upon by the labor organization and the Authority." *Id.* In any such arbitration, the determination of a majority of the board of arbitration "shall be final and binding on all matters in dispute." *Id.* In this type of arbitration, commonly referred to as "interest arbitration," the "arbitrator, instead of interpreting and applying the terms of an agreement to decide a grievance, determines what provisions the parties are to have in their collective bargaining agreement." *See* U.S. Office of Personnel Management, Labor-Management Relations Glossary, *available at* http://www.opm.gov/lmr/glossary/glossaryi.asp.

The most recent collective bargaining agreement ("CBA") between WMATA and the Union covered the period from May 1, 2004 through June 30, 2008. In August 2008, when negotiations over the terms and conditions of a new CBA reached an impasse, the matter proceeded to interest arbitration before a three-person Board, as required by the Compact. The three-person Board consisted of Thomas R. Roth (representing the Union), R. Theodore Clark,

Jr. (a member of WMATA's board of directors), and Richard R. Kasher (an experienced arbitrator who was designated to serve as the Board's Neutral Chairman).

On November 4, 2009, after 15 days of hearings, extensive briefing, and the submission of some 500 exhibits, the Board issued a 15-page Interest Arbitration Opinion and Award ("Award") that defined key terms and conditions of a new CBA for the period from July 1, 2008 through June 30, 2012. Of particular relevance to this appeal, the Award granted Union members the following general wage adjustments: a 2 percent lump-sum payment effective July 1, 2008; and annual 3 percent general wage increases effective on July 1 in the years 2009, 2010, and 2011. The Award declined to "increas[e] pension formulas or chang[e] the character of the [employee pension plan] from a defined benefit plan to a plan requiring employee contributions . . . ."

The two partisan members of the Board issued partially dissenting opinions. Union Representative Roth objected to certain adjustments to the Union members' employee health plan and the exclusion of certain classes of employees from a provision granting additional wage increases to elevator and escalator maintenance personnel. WMATA Representative Clark objected to the Award's general wage increases and its refusal to make adjustments to the Union members' employee pension plan. Of particular note, Clark argued that the Board's decision failed to comply with the Standards Act, 40 U.S.C. §§ 18301-18304, which requires an "arbitrator rendering an arbitration award involving the employees of an interstate compact agency operating in the national capital area" to consider certain statutorily-imposed factors when making "a finding or a decision for inclusion in a collective bargaining agreement governing conditions of employment," 40 U.S.C. § 18303(b). Among the factors that the Standards Act requires an arbitrator to consider is the "public welfare," 40 U.S.C. § 18303(b)(7),

which is defined to include "the financial ability of the individual jurisdictions participating in the compact to pay for the costs of providing public transit services," 40 U.S.C. § 18303(a)(1). According to Clark, the Award merely declared that the Neutral Chairman had "given full and thorough consideration to the criteria" outlined in the Standards Act, but failed to provide any discussion or analysis applying the statutory factors to the evidence in the record. This, Clark argued, violated the Standards Act's requirement that "the arbitrator shall issue a written award that demonstrates that all the factors set forth in [the Standards Act] have been considered and applied." 40 U.S.C. § 18303(d)(1).

On November 5, 2009, the day after the Board handed down the Award, WMATA announced its intention to appeal the Board's decision. *See* Press Release, Washington Metropolitan Area Transit Authority, Metro Will Appeal Decision of Arbitration Award as Legally Flawed (Nov. 5, 2009), *available at* http://www.wmata.com/about_metro/news/PressReleaseDetail.cfm?ReleaseID=4135. A few days later, on November 9, 2009, the Union filed its own suit in this Court, seeking to obtain confirmation and enforcement of the Award. Then, on November 13, 2009, WMATA followed with its suit in this Court, in which it asked the Court to vacate the wage increase and pension benefits provisions of the Award. By Order dated January 27, 2010, the Court consolidated the two lawsuits.

On April 1, 2010, following oral argument on the parties' cross-motions for summary judgment, the Court issued an Order confirming the Award except as to those provisions addressing general wage adjustments and pension benefits.[3] Concluding that the disputed

---

[3] WMATA had asked the Court to vacate only the wage adjustments and pension benefits provisions; the Union had sought confirmation of the entire Award.

provisions of the Award did not demonstrate the required compliance with the Standards Act,[4] the Court remanded the case to the Board "to render a supplemental opinion within 90 days regarding the General Wage Adjustments and Pension sections that complies with the [Standards Act], specifically 40 U.S.C. § 18303(d)." The Court retained jurisdiction to review the supplemental opinion and issue a final ruling on the parties' cross-motions for summary judgment.

On June 22, 2010, the Board, through Neutral Chairman Kasher, issued an eight-page Supplemental Opinion. Although the Supplemental Opinion contained a brief additional discussion of the various statutory factors outlined in the Standards Act, like its predecessor it contained no detailed analysis of those factors, nor did it provide a roadmap that might direct the Court to the specific evidence the Board had considered and weighed in reaching its conclusions. For example, with respect to the Standards Act's requirement that the Board consider the "public welfare," 40 U.S.C. § 18303(b)(7), the Supplemental Opinion said only the following:

> It is my opinion that the term 'public welfare' is susceptible to several reasonable interpretations, depending upon the view of the 'beholder.' It is an amorphous term, lacking a specific definition in the [Standards] Act.

> It is subject to dispute as to the extent to which each of the seven factors considered by the arbitration panel should have been 'weighed.' There is no reason to conclude from reading the [Standards] Act that one factor is more important than another, or that the 'public welfare' standard trumped all of the other factors which the arbitration panel was to consider. . . .

> Absent a formula in the [Standards] Act quantifying the 'public welfare' standard, it was my opinion that both WMATA's proposal and the [Union]'s proposal could

---

[4] Although certain aspects of the Standards Act—such as the statute's legislative history—had not yet been fully briefed by the time of oral argument, the Court was nevertheless able to reach the following preliminary conclusions: (1) that the Standards Act applied to the arbitration proceedings at issue; (2) that the Union's constitutional challenges to the Act were unavailing, primarily because of procedural infirmities, including lack of standing on the part of the Union; and (3) that the Award, as drafted, clearly did not demonstrate full compliance with the Standards Act, whatever the specific contours of the Act's requirements might be.

have been fit within this standard. It is my further opinion that the November 4, 2009 [Award] also fits within the standard.

In response to the Board's Supplemental Opinion, the parties again filed cross-motions for summary judgment, and on August 10, 2010 the Court again heard oral argument. This time the Court deferred its final ruling on the motions to allow for consideration of three additional issues, which the parties were asked to address in supplemental briefing: (1) the historical background of interest arbitrations in labor disputes; (2) the nature of interest arbitration cases involving mass transit systems; and (3) the legislative history of the Standards Act. The parties have since submitted this supplemental briefing.

## II.

Without a doubt, the critical issue in the case is what standard applies to review of the Board's decision.[5]

Ordinarily a court's review of an arbitration award is extremely narrow. It may only overturn an arbitration award under extraordinary circumstances, such as where "an award fails to draw its essence from the contract, or the award evidences a manifest disregard of the law." *MCI Constructors, LLC v. City of Greensboro*, 610 F.3d 849, 857 (4th Cir. 2010) (internal citations and quotation marks omitted). Indeed, "the scope of judicial review for an arbitrator's decision is among the narrowest known at law because to allow full scrutiny of such awards would frustrate the purpose of having arbitration at all—the quick resolution of disputes and the avoidance of the expense and delay associated with litigation." *Id.* (internal citations and quotation marks omitted). Under this standard of review, the Court's task would be relatively

---

[5] At oral argument the Court suggested that the standard of review imposed by the Standards Act seemed to require something more than what would normally apply in an arbitration setting. This Opinion presents the Court with an opportunity to discuss the standard of review in detail.

simple, since nothing less than truly improper conduct on the part of the Board would permit the Court to reject the Board's conclusions.

Here, however, the Court is faced with the unique language of the Standards Act, which not only imposes specific duties on "arbitrators resolving disputes involving interstate compact agencies operating in the national capital area," *see* 40 U.S.C. § 18301(b), but which also imposes a specific standard of review for courts reviewing final awards issued by such arbitrators, *see* 40 U.S.C. § 18304(c). Specifically, the Act requires the court to vacate an award, or any part thereof, if, among other things, "the decision by the arbitrator is arbitrary or capricious," 40 U.S.C. § 18304(c)(3), *or* if "the arbitrator did not comply with the provisions of section 18303" of the Act, 40 U.S.C. § 18304(c)(7), which in turn requires that the arbitrator consider several precise statutory factors and demonstrate that his conclusions regarding the "public welfare" are supported by "substantial evidence," *see* 40 U.S.C. § 18303.

WMATA has consistently argued that the Standards Act requires the Court to "apply the criteria developed by the courts for review of decisions under the Administrative Procedure Act ('APA')," 5 U.S.C. § 500 *et seq.* This is so, WMATA says, because "although the arbitration panel is not a federal agency, the text of the [Standards Act]" —particularly its invocation of administrative law standards such as "substantial evidence" and "arbitrary or capricious" — "clearly indicates that Congress intended that judicial review follow the basic APA principles courts utilize to analyze agency compliance with a federal statute." The Union, on the other hand, argues that, although the factors articulated by the Standards Act should not be "ignored," the Act cannot be read to "supersede the law regarding judicial review of arbitration awards involving WMATA" because to do so would render such awards "not final and binding as

existing arbitration statutes and law provide." The Union further maintains that adoption of the standard urged by WMATA would be unconstitutional.

This much is apparent: The untangling of the web this case has woven requires the Court to consider at least three possible standards of judicial review—namely: (1) that which typically applies when a court reviews the decision of an arbitration panel; (2) that which typically applies to a court's review of the decision of an administrative agency; and (3) that which applies under the Standards Act, which may very well constitute a complex "hybrid" of the two other standards. The Court now considers each of these three standards.

## A.

The standard of judicial review that customarily applies to arbitral awards is uniquely deferential. As noted earlier, longstanding precedent holds that judicial review of arbitral awards in the collective bargaining context is "among the narrowest known to the law." *See Union Pac. R.R. v. Sheehan*, 439 U.S. 89, 91 (1978) (internal quotation marks omitted).[6] A court is not entitled to decide the merits of an arbitrated dispute. Instead, "if an arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, the fact that a court is convinced he committed serious error does not suffice to overturn his decision." *Major League Baseball Players Ass'n v. Garvey*, 532 U.S. 504, 509 (2001) (internal citations and quotation marks omitted). Nor is a court permitted to second-guess factual determinations. "When an arbitrator resolves disputes regarding the application of a contract, and no dishonesty is alleged, the arbitrator's 'improvident, even silly, factfinding' does not provide a basis for a

---

[6] Prior to the adoption of the Standards Act, the D.C. Circuit held that neither the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1-16, nor the arbitration statutes of the Compact states applied to labor disputes involving WMATA and its employees. *See Office & Prof'l Employees Int'l Union, Local 2 v. Wash. Metro. Area Transit Auth.*, 724 F.2d 133, 139 (D.C. Cir. 1983) (holding that only the common law of arbitration, and not the FAA or local arbitration acts, applies to labor disputes involving WMATA) (pre-Standards Act decision).

reviewing court to refuse to enforce the award." *Id.* (quoting *Paperworkers v. Misco, Inc.*, 484 U.S. 29, 39 (1987)). Indeed, an arbitrator need not even explain his decision, whether in the form of a written opinion or otherwise. *See United Steelworkers of Am. v. Enter. Wheel & Car Corp.*, 363 U.S. 593, 598 (1960) ("Arbitrators have no obligation to the court to give their reasons for an award."). The rationale behind this deference to the arbitrator is that it is the arbitrator's interpretation of the facts and the agreement that the parties bargained for, so it is the arbitrator's ruling that the parties should get, so long as the arbitrator "did his job." *See Mountaineer Gas Co. v. Oil, Chem. & Atomic Workers Int'l Union*, 76 F.3d 606, 608 (4th Cir. 1996); *Enterprise Wheel*, 363 U.S. at 599.

The limited circumstances under which the court may vacate an arbitral award on the merits is "when the arbitrator strays from interpretation and application of the agreement and effectively 'dispense[s] his own brand of industrial justice.'" *Garvey*, 532 U.S. at 509 (quoting *Enterprise Wheel*, 363 U.S. at 597). A court "may vacate an arbitrator's award only if it 'violates clearly established public policy, fails to draw its essence from the collective bargaining agreement, or reflects merely the arbitrator's personal notions of right and wrong.'" *Yuasa, Inc. v. Int'l Union of Electronic, Electrical, Salaried, Mach. & Furniture Workers*, 224 F.3d 316, 321 (4th Cir. 2000) (quoting *Champion Int'l Corp. v. United Paperworkers Int'l Union*, 168 F.3d 725, 729 (4th Cir. 1999)). The central consideration in determining whether the award "drew its essence" from the agreement is the text of the agreement. *See Mountaineer Gas*, 76 F.3d at 608. The Fourth Circuit has elaborated on the meaning of this term as follows:

> Put simply, an arbitrator's legal determination 'may only be overturned where it is in manifest disregard of the law,' and an arbitrator's interpretation of a contract must be upheld so long as it 'draws its essence from the agreement.' *Upshur Coals Corp. v. United Mine Workers, Dist. 31*, 933 F.2d 225, 229 (4th Cir. 1991) (internal quotation marks omitted). Under our precedent, a manifest disregard of

the law is established only where the 'arbitrator [] understand[s] and correctly state[s] the law, but proceed[s] to disregard the same.' *Id.* (internal quotation marks omitted). Moreover, an arbitration award does not fail to draw its essence from the agreement merely because a court concludes that an arbitrator has 'misread the contract.' *Id.* (internal quotation marks omitted). An arbitration award fails to draw its essence from the agreement only when the result is not 'rationally inferable from the contract.' *Apex Plumbing Supply, Inc. v. U.S. Supply Co.*, 142 F.3d 188, 193 n.5 (4th Cir. 1998).

*Patten v. Signator Ins. Agency, Inc.*, 441 F.3d 230, 235 (4th Cir. 2006).

## B.

In contrast, the standard of judicial review that applies to administrative agency decisions is distinctly less deferential than that applicable to review of arbitral awards. The federal Administrative Procedure Act ("APA"), 5 U.S.C. § 500 *et seq.*, outlines the procedures governing adjudication and rulemaking by federal administrative agencies. Under the APA's judicial review provisions, final agency decisions are reviewed on the basis of whether they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), or, in the case of agency decisions flowing from formal rulemaking or formal adjudication, to determine if they are "unsupported by substantial evidence," 5 U.S.C. § 706(2)(E). *See, e.g., Knox v. U.S. Dep't of Labor*, 434 F.3d 721, 723-24 (4th Cir. 2006) (noting that, "[u]nder the [APA], federal courts can overturn an administrative agency's decision only if it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law, or unsupported by substantial evidence") (internal citations and quotation marks omitted). Any final agency decision is generally subject to judicial review, *see* 5 U.S.C. § 704, so long as no statute precludes judicial review and the decision is not "committed to agency discretion by law," 5 U.S.C. § 701(a).

Many courts have noted that the distinction between the arbitrary or capricious test and the substantial evidence[7] test is "largely semantic," especially in the context of informal administrative rulemaking. *See, e.g., Ass'n of Data Processing Serv. Orgs., Inc. v. Bd. of Governors of the Fed. Reserve Sys.*, 745 F.2d 677, 684 (D.C. Cir. 1984); *Amusement & Music Operators Ass'n v. Copyright Royalty Tribunal*, 676 F.2d 1144, 1151 (7th Cir. 1982). Be that as it may, to the extent that a distinction between the two tests arguably remains—at least in the formal adjudication context—it is probably fair to say that the substantial evidence test is the more searching of the two, at least insofar as it requires a finding of factual support in the formal record as opposed to elsewhere. *See, e.g., Bangor Hydro-Elec. Co. v. Fed. Energy Regulatory Comm'n*, 78 F.3d 659, 663 n.3 (D.C. Cir. 1996); *Corrosion Proof Fittings v. EPA*, 947 F.2d 1201, 1214 (5th Cir. 1991).

In applying the substantial evidence standard to review of an administrative agency's decision, the court may not substitute its own views for those of the agency. *See, e.g., Mastro v. Apfel*, 270 F.3d 171, 176 (4th Cir. 2001) ("In reviewing for substantial evidence, the court should not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the [agency].") (internal citations and quotation marks omitted); *Wyo. Farm Bureau Fed'n v. Babbitt*, 199 F.3d 1224, 1231 (10th Cir. 2000) ("The substantial evidence standard does not allow a court to displace the [agency's] choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo*.") (internal citations and quotation marks omitted). Rather, the court must merely undertake to determine whether the agency's decision is supported by "such relevant

---

[7] Although typically analyzed and applied in the modern administrative law context, the substantial evidence standard predates the 1946 arrival of the APA. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477-78 (1951) (citing pre-1946 cases applying the substantial evidence standard).

evidence as a reasonable mind might accept as adequate to support a conclusion." *Mastro*, 270

F.3d at 176 (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). Substantial evidence

"consists of more than a mere scintilla of evidence but may be somewhat less than a

preponderance." *Id.* (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). Indeed,

"[e]vidence is substantial in the APA sense if it is enough to justify, if the trial were to a jury, a

refusal to direct a verdict when the conclusion to be drawn is one of fact." *Olenhouse v.*

*Commodity Credit Corp.*, 42 F.3d 1560, 1575 (10th Cir. 1994) (citing *Ill. Cent. R.R. Co. v.*

*Norfolk & W. Ry. Co.*, 385 U.S. 57, 66 (1966)).

Even so, despite the highly deferential nature of judicial review under the substantial

evidence and arbitrary or capricious standards, the court will not uphold an administrative

agency's decision if the agency failed to consider all relevant evidence and/or failed to articulate

an adequate explanation for its conclusions. *See, e.g.*, *Ohio Valley Envtl. Coalition v. Aracoma*

*Coal Co.*, 556 F.3d 177, 192 (4th Cir. 2009) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm*

*Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)) (noting that, to uphold an agency action, a court

must find that "the agency has examined the relevant data" and has provided an explanation of

its decision that includes "a 'rational connection between the facts found and the choice made'");

*Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997) ("Before we can

determine whether substantial evidence supports an administrative determination, we must first

ascertain whether the agency has discharged its duty to consider all relevant evidence. . . .

[U]nless the [agency] has analyzed all evidence and has sufficiently explained the weight [it] has

given to obviously probative exhibits, to say that [its] decision is supported by substantial

evidence approaches an abdication of the court's duty to scrutinize the record as a whole to

determine whether the conclusions reached are rational.") (internal citations and quotation marks

omitted); *Gordon v. Schweiker*, 725 F.2d 231, 235 (4th Cir. 1984) ("We cannot determine if findings are unsupported by substantial evidence unless the [agency] explicitly indicates the weight given to all of the relevant evidence."); *Dickson v. Sec'y of Defense*, 68 F.3d 1396, 1404 (D.C. Cir. 1995) ("The requirement that agency action not be arbitrary and capricious includes a requirement that the agency adequately explain its result. The arbitrary and capricious standard of the APA mandates that an agency take whatever steps it needs to provide an explanation that will enable the court to evaluate the agency's rationale at the time of decision.") (internal citations and quotation marks omitted); *Getty v. Fed. Sav. & Loan Ins. Corp.*, 805 F.2d 1050, 1055 (D.C. Cir. 1986) (citing *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 419-20 (1971)) ("[E]ven in informal adjudication an agency must provide the court an explanation sufficient to allow us to properly carry out our review.").

When a statute requires an agency to consider particular statutory factors, the agency's decision must do more than merely state that the factors were considered. *See, e.g.*, *Getty*, 805 F.2d at 1055 ("Stating that a factor was considered . . . is not a substitute for considering it. We must make a searching and careful inquiry to determine if [the agency] actually *did* consider it.") (emphasis in original) (internal citations and quotation marks omitted). Merely parroting the requisite statutory factors, or indicating in boilerplate language that they were considered, is insufficient for the agency to demonstrate that its decision was supported by substantial evidence. *See, e.g.*, *Dickson*, 68 F.3d at 1405 ("When an agency merely parrots the language of a statute without providing an account of how it reached its results, it has not adequately explained the basis for its decision."). Rather, the agency's decision must include the "critical step [of] connecting the facts to the conclusion." *Id.*

When an administrative agency fails to consider all of the relevant evidence or fails to provide an adequate explanation for its decision, courts routinely remand the case to the agency for further proceedings and/or a more reasoned explanation. *See, e.g.*, *Sterling Smokeless Coal*, 131 F.3d at 441-42 (vacating and remanding after concluding that the agency had failed to fulfill its "statutory obligation to consider all of the relevant evidence"); *Dickson*, 68 F.3d at 1407 (vacating and remanding after concluding that "the conclusory statements of the [agency] . . . do not meet the requirement that the agency adequately explain its result") (internal citations and quotation marks omitted); *Tex Tin Corp. v. EPA*, 935 F.2d 1321, 1324 (D.C. Cir. 1991) ("Where the agency has failed to . . . explain the path that it has taken, we have no choice but to remand for a reasoned explanation . . . .").

## C.

The Standards Act, which unquestionably applies to this case, suggests that a third, "hybrid" standard of review may be appropriate. A brief overview of the Act will aid the Court's discussion.

Section 18301 of the Act sets forth the "findings and purposes" that justify its enactment. Congress makes seven distinct findings, all of which relate to the economic challenges posed by increasing labor costs incurred in providing for public transit in the national capital area. *See* 40 U.S.C. § 18301(a). Among its findings, Congress declares that:

> (1) affordable public transportation is essential to the economic vitality of the national capital area . . . ;
>
> (2) use of mass transit by both residents of and visitors to the national capital area is substantially affected by the prices charged for mass transit services, prices that are substantially affected by labor costs . . . ;

(3) labor costs incurred in providing mass transit in the national capital area have increased at an alarming rate and wages and benefits of operators and mechanics currently are among the highest in the Nation; . . .

(5) spiraling labor costs cannot be offset by the governmental entities that are responsible for subsidy payments for public transit services since local governments generally, and the District of Columbia government in particular, are operating under severe fiscal constraints; [and]

(6) imposition of mandatory standards applicable to arbitrators resolving arbitration disputes involving interstate compact agencies operating in the national capital area will ensure that wage increases are justified and do not exceed the ability of transit patrons and taxpayers to fund the increase; . . .

*Id.* In addition, § 18301 states that the purpose of the Act "is to adopt standards governing arbitration that *must be applied* by arbitrators resolving disputes involving interstate compact agencies operating in the national capital area[8] *in order to lower operating costs for public transportation in the Washington metropolitan area*." 40 U.S.C. § 18301(b) (emphasis added). Thus, from the outset, the Standards Act makes eminently clear that its purpose is to compel arbitrators resolving labor disputes pursuant to the Compact both to consider and to *apply* the factors designed to meet the express goal of lowering public transportation costs in the Washington, D.C. area.[9]

The Standards Act also provides that an arbitrator rendering an award involving the employees of an interstate compact agency operating in the national capital area *must* consider seven specific statutory factors, *see* 40 U.S.C. § 18303(b), namely:

---

[8] The statute defines an "interstate compact agency operating in the national capital area" as "any interstate compact agency that provides public transit services and that was established by an interstate compact to which the District of Columbia is a signatory." 40 U.S.C. § 18302(3). As the parties have noted, WMATA clearly falls within the four corners of that definition, and indeed appears to be the sole entity that does.

[9] The Standards Act does not apply to *all* arbitrations initiated pursuant to the Compact, but only to those which, like the present arbitration, concern "the terms and conditions of employment . . . ." 40 U.S.C. § 18302(1)(A). The Act also states that it does not apply to collective bargaining agreements consummated prior to the statute's enactment. *See* 40 U.S.C. § 18302(1)(B) (stating that the Act does not apply to "the interpretation and application of rights arising from an existing collective bargaining agreement").

(1) The existing terms and conditions of employment of the employees in the bargaining unit.

(2) All available financial resources of the interstate compact agency.

(3) The annual increase or decrease in consumer prices for goods and services as reflected in the most recent consumer price index for the Washington metropolitan area, published by the Bureau of Labor Statistics.

(4) The wages, benefits, and terms and conditions of the employment of other employees who perform, in other jurisdictions in the Washington standard metropolitan statistical area, services similar to those in the bargaining unit.

(5) The special nature of the work performed by the employees in the bargaining unit, including any hazards or the relative ease of employment, physical requirements, educational qualifications, job training and skills, shift assignments, and the demands placed upon the employees as compared to other employees of the interstate compact agency.

(6) The interests and welfare of the employees in the bargaining unit, including—

> (A) the overall compensation presently received by the employees, having regard not only for wage rates but also for wages for time not worked, including vacations, holidays, and other excused absences;
>
> (B) all benefits received by the employees, including previous bonuses, insurance, and pensions; and
>
> (C) the continuity and stability of employment.

(7) The public welfare.[10]

---

[10] Although Neutral Chairman Kasher stated in the Supplemental Opinion that the "public welfare" is "an amorphous term lacking a specific definition in the [Standards] Act," that is not so. The statute defines the "public welfare" as follows:

> (1) the financial ability of the individual jurisdictions participating in the compact to pay for the costs of providing public transit services; and
>
> (2) the average per capita tax burden, during the term of the collective bargaining agreement to which the arbitration relates, of the residents of the Washington metropolitan area, and the effect of an arbitration award rendered under that arbitration on the respective income or property tax rates of the jurisdictions that provide subsidy payments to the interstate compact agency established under the compact.

40 U.S.C. § 18303(a).

40 U.S.C. § 18303(b). This section further provides that the arbitrator "may not . . . provide for salaries and other benefits that exceed the ability of the interstate compact agency, or of any governmental jurisdiction that provides subsidy payments or budgetary assistance to the interstate compact agency, to obtain the necessary financial resources to pay for wage and benefit increases for employees of the interstate compact agency." 40 U.S.C. § 18303(c).

Certain other requirements pertain to the issuance of the arbitrator's final award. Section 18303(d)(1) provides that the arbitrator "shall issue a *written* award that demonstrates that *all* the factors set forth in [40 U.S.C. § 18303(b)-(c)] have been *considered* and *applied*." 40 U.S.C. § 18303(d)(1) (emphasis added). Section 18303(d)(2) indicates that the arbitrator may grant an increase in pay or benefits "only if the arbitrator concludes that any costs to the agency do not adversely affect the public welfare." 40 U.S.C. § 18303(d)(2). Section 18303(d)(3) states that the "arbitrator's conclusion regarding the public welfare *must* be supported by *substantial evidence*." 40 U.S.C. § 18303(d)(3) (emphasis added).

Finally, and most central for present purposes, the Act establishes specific requirements for judicial review of arbitration awards, namely that:

> The court shall review the award *on the record*, and *shall vacate* the award *or any part of the award*, after notice and a hearing, if—
>
> (1) the award is in violation of applicable law;
>
> (2) the arbitrator exceeded the arbitrator's powers;
>
> (3) the decision by the arbitrator is *arbitrary or capricious*;
>
> (4) the arbitrator conducted the hearing *contrary to the provisions of this chapter* or other laws or rules that apply to the arbitration so as to substantially prejudice the rights of a party;
>
> (5) there was partiality or misconduct by the arbitrator prejudicing the rights of a party;

(6) the award was procured by corruption, fraud, or bias on the part of the arbitrator; or

(7) the arbitrator *did not comply with the provisions of section 18303*[11] of this title.

40 U.S.C. § 18304(c) (emphasis added).

Would that there were further guidance beyond the language of the Standards Act itself. But, as it happens, there is not. Beyond the language of the Act, the Court enters virgin territory. Research has uncovered no judicial opinion, indeed no commentary—published or otherwise— that examines, analyzes, applies, or even cites the Act. The statute's legislative history is thin to the point of virtual non-existence. Aside from a single House Appropriations Committee report that essentially repeats the language of the Act,[12] the legislative record casts no light at all on Congressional intent. This means, of course, that the Court is left to divine the extent to which, if

---

[11] As previously described, § 18303 outlines seven factors that the arbitrator must consider, *see* 40 U.S.C. § 18303(b)-(c); requires the arbitrator to issue a written award demonstrating that all of the factors have been considered and applied, *see* 40 U.S.C. § 18303(d)(1); and mandates that the arbitrator's conclusion regarding the public welfare be supported by substantial evidence, *see* 40 U.S.C. § 18303(d)(3).

[12] The Standards Act was included in H.R. 2002, 104th Cong. (1995), an appropriations bill for the Department of Transportation and related agencies. Insofar as it discusses the Standards Act, the sum and substance of the House Appropriations Committee's report on the bill was the following:

> Title IV of the bill provides standards for an arbitrator to consider in making an arbitration award involving the Washington Metropolitan Area Transit Authority (WMATA). The arbitrator may not make an award unless several factors have been considered, including the financial ability of the transit agency and the participating governments, the regional consumer price index, and wages and benefits for comparable work elsewhere in the region. This title ensures that the arbitrator will consider financial ability of the local jurisdictions, i.e., Maryland, Virginia and the District of Columbia, and the transit agency in making a determination. This measure will assist WMATA [in] manag[ing] its labor costs at a time when federal dollars are increasingly scarce and state and local jurisdictions, including the District of Columbia, are facing severe budget constraints.

> There is a clear federal interest in providing affordable public transit in the national capital region. In view of the large federal workforce and the millions of visitors each year to the national capital region, Congress has a responsibility to address this significant labor issue facing WMATA. It is the Committee's expectation that this title will preserve affordable transit in the nation's capital in perpetuity.

H.R. Rep. No. 104-177, at 175-76 (1995).

at all, the Standards Act was intended to modify judicial review of arbitration awards in the ordinary setting.

The Court, therefore, recurs to the statute's plain language. This is what it establishes: (1) that the Act was passed for the express purpose of lowering public transportation costs in the Washington, D.C. area,[13] *see* 40 U.S.C. § 18301(b); (2) that the Act compels arbitrators resolving labor disputes pursuant to the Compact to both *consider* and *apply*, *in writing*, numerous factors designed to meet the statute's express goal, *see* 40 U.S.C. §§ 18303(b), 18303(c), & 18303(d)(1); (3) that arbitrators may award increases in pay and benefits only where any costs to WMATA will not "adversely affect the public welfare," *see* 40 U.S.C. § 18303(d)(2); (4) that the arbitrator's conclusions regarding the public welfare must be supported by *substantial evidence*, *see* 40 U.S.C. § 18303(d)(3); and (5) that a court reviewing an award made pursuant to arbitration under the Compact *must vacate* the award, or *any part thereof*, if the award is *arbitrary or capricious*, if the arbitrator did not properly consider and apply the various statutory factors *in writing*, or if the arbitrator's conclusions regarding the public welfare are unsupported by *substantial evidence*, *see* 40 U.S.C. § 18304(c). A fair reading of the language of the statute can only signify that the Act imposes more stringent requirements—both on arbitrators and on reviewing courts—than would ordinarily apply under the common law of arbitration.

### III.

As noted *supra*, WMATA has argued that the Standards Act requires the Court to "apply the criteria developed by the courts for review of decisions under the [APA]." This is so, WMATA submits, because "although the arbitration panel is not a federal agency, the text of the

---

[13] Today, more than 15 years after the passage of the Standards Act, WMATA continues to face well-documented economic challenges. *See, e.g.*, Ann Scott Tyson, *Metro's Budget Numbers Include a $72 Million Gap*, Wash. Post, Jan. 14, 2011, at B4.

[Standards Act] clearly indicates that Congress intended that judicial review follow the basic APA principles courts utilize to analyze agency compliance with a federal statute." The Union, on the other hand, argues that, although the factors articulated by the Standards Act should not be "ignored," the Act cannot be read to "supersede the law regarding judicial review of arbitration awards involving WMATA" because to do so would render such awards "not final and binding as existing arbitration statutes and law provide."

The Court finds that WMATA has the better part of the argument. While it is certainly true that an arbitration panel organized pursuant to the Compact is not a federal agency, the Court cannot shut its eyes to the fact that, in passing the Standards Act, Congress mandated that labor arbitration awards involving WMATA be reviewed according to standards of review—e.g., "substantial evidence," *see* 40 U.S.C. § 18303(d)(3), "arbitrary or capricious," *see* 40 U.S.C. § 18304(c)(3), "contrary to . . . law[],"[14] *see* 40 U.S.C. § 18304(c)(4), etc.—that have evolved over time in the administrative law context. Thus, absent some indication to the contrary in the Act's legislative history or in case authority interpreting the Standards Act, the Court is constrained to conclude that Congress, through the Act, did abrogate the common law of arbitration as it applies to the Compact and that the Court must evaluate Compact arbitration awards through the lens of the more searching, "APA-style" standard of review. Decisions made in the administrative law context—i.e., cases applying the substantial evidence and arbitrary or capricious standards— must guide the Court's conclusions in cases such as the present one.

What, then, is the precise standard of review that applies when a court evaluates the validity of an employment-related arbitration award issued pursuant to the Compact? In

---

[14] Though not discussed here, the "contrary to law" or "not in accordance with law" standard is also frequently invoked in the administrative law setting. *See, e.g.*, 5 U.S.C. § 706(2)(A) (requiring reviewing courts to set aside agency action "not in accordance with law"); *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 69 (2004) (noting that agency action can be set aside if it is "contrary to law").

answering this question, the Court begins its analysis mindful of the Standards Act's admonition that it must determine: (1) whether the award is *arbitrary or capricious*; (2) whether the arbitration panel properly considered and applied the Standards Act's various statutory factors in writing; and (3) whether the arbitrator's conclusions regarding the public welfare are supported by *substantial evidence*.[15] *See* 40 U.S.C. §§ 18303, 18304(c).

Although, as always, a reviewing court may not substitute its own views for those of a Compact arbitration panel,[16] *see, e.g.*, *Mastro*, 270 F.3d at 176, it remains obliged to determine whether the panel's decision is supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," *see id.* (quoting *Richardson*, 402 U.S. at 401). Further, while this standard of review is highly deferential, the court will not uphold a Compact arbitration panel's decision if the panel failed to consider all relevant evidence and/or failed to articulate an adequate explanation for its conclusions. *See, e.g.*, *Ohio Valley Envtl. Coalition*, 556 F.3d at 192 (quoting *State Farm*, 463 U.S. at 43). Indeed, when a court concludes that a Compact arbitration panel's decision has failed to satisfy this standard, the court "shall vacate the award or any part of the award, after notice and a hearing . . . ." 40 U.S.C. § 18304(c).

Because the Standards Act requires a Compact arbitration panel to consider explicit statutory factors, *see* 40 U.S.C. § 18303(b)-(c), the Court holds that the panel's written decision must do more than merely state that those factors were considered. *See, e.g.*, *Getty*, 805 F.2d at 1055. Merely indicating in boilerplate language that the requisite statutory factors were

---

[15] A reviewing court must also consider, pursuant to the Act, whether the award is in violation of some other law; whether the arbitrator otherwise exceeded his powers; whether there was partiality or misconduct by the arbitrator; and/or whether the award was procured by corruption, fraud, or bias on the part of the arbitrator. *See* 40 U.S.C. § 18304(c). Neither party has alleged that any of these considerations is implicated in the present case.

[16] As suggested *supra*, the standard of review articulated here will not apply to *all* arbitrations initiated pursuant to the Compact, but rather only to those Compact arbitrations for which the Standards Act applies, i.e., those concerning "the terms and conditions of employment . . . ." 40 U.S.C. § 18302(1)(A).

considered does not demonstrate that the panel's decision was supported by substantial evidence. *See, e.g.*, *Dickson*, 68 F.3d at 1405. The panel's decision must include the "critical step [of] connecting the facts to the conclusion." *See id.* When a Compact arbitration panel fails to consider all of the relevant evidence or fails to provide an adequate explanation for its decision, the reviewing court must, at a minimum, remand the case to the panel for a more reasoned explanation. *See, e.g.*, *Sterling Smokeless Coal*, 131 F.3d at 441-42; *Dickson*, 68 F.3d at 1407; *Tex Tin Corp.*, 935 F.2d at 1324.

Although the precise requirements for a Compact arbitration panel's written decision may vary from case to case depending upon the matter or matters at issue, compliance with the Standards Act requires that the panel issue a detailed written explanation of its decision that, at a minimum: (1) discusses each of the statutory factors in some detail; (2) applies each of the factors to the dispute at issue; (3) points to specific evidence in the record—by making reference to exhibits—relevant to each and every statutory factor; (4) weighs the applicable evidence pro and con; (5) states the panel's ultimate conclusions; and (6) provides a clear explanation of the reasoning behind the panel's ultimate conclusions. If the panel's written decision fails to perform each of these six tasks, the court has no alternative but to conclude, whatever the underlying merits of the panel's decisions, that the panel has failed to articulate an adequate explanation for its conclusions. *See, e.g.*, *Ohio Valley Envtl. Coalition*, 556 F.3d at 192 (quoting *State Farm*, 463 U.S. at 43).

Lest this articulation of the applicable standard of review be construed as a sharp departure from what would apply in a conventional arbitration setting, the Court notes that standards of this sort are not entirely foreign to arbitration proceedings. As the U.S. Court of Appeals for the Fourth Circuit, whose rulings bind this Court, has held, a court may overturn an

arbitration award where the arbitrator attempts to shield an award by merely stating, without discussing, a critical issue or factor. *See Clinchfield Coal Co. v. Dist. 28, United Mine Workers*, 720 F.2d 1365, 1369 (4th Cir. 1983) ("[A]n arbitrator [may not] shield his award simply by the ruse of stating an issue without discussing it. . . . Where, as here, the arbitrator fails to discuss critical contract terminology, which terminology might reasonably require an opposite result, the award cannot be considered to draw its essence from the contract."). Equally important, there is ample authority for the proposition that less deference is owed to the decision of an arbitrator when the arbitrator's powers are, as here, defined by statute. *See Madison Landfills, Inc. v. Libby Landfill Negotiating Comm.*, 509 N.W.2d 307, 311 (Wis. Ct. App. 1993) (suggesting that a less deferential standard of review applies "where the powers of the arbitrator are defined by statute"); *Ales v. Anderson, Gabelmann, Lower & Whitlow, P.C.*, 728 N.W.2d 832, 839 (Iowa 2007) (permitting a statute to impose a substantial evidence standard on a court's review of an arbitrator's decision); *see also* 4 Am. Jur. 2d Alternative Dispute Resolution § 206 (2d ed. 2007) ("The principle that an arbitrator's award will not be overturned for an error of law not amounting to manifest disregard of the law may not apply where the powers of the arbitrator are defined by statute."); 4 Am. Jur. 2d Alternative Dispute Resolution § 208 (2d ed. 2007) ("[A] statute may allow a court to vacate an arbitration award when substantial evidence on the record as a whole does not support the award."). Additionally, state-court precedent, including cases decided in the mass transit context,[17] strongly suggests that interest arbitration awards—as opposed to general arbitration awards—are subject to elevated judicial scrutiny. *See, e.g.*,

---

[17] New York and Massachusetts have statutory schemes that require mass transit labor arbitrators to consider certain statutory factors. *See* N.Y. Civ. Serv. Law § 209(5)(d) (requiring labor arbitration panels considering disputes involving the New York City Transit Authority to consider six different factors, including "the interest and welfare of the public"); Mass. Gen. Laws ch. 161A, § 31 (requiring arbitrators considering disputes involving the Massachusetts Bay Transportation Authority to rely on nine different factors, including "the financial ability of the individual communities and the commonwealth to meet additional costs").

*Hillsdale PBA Local 207 v. Borough of Hillsdale*, 644 A.2d 564, 570 (N.J. 1994) ("Judicial scrutiny in public interest arbitration is more stringent than in general arbitration. The reason for more intensive review of public interest arbitration is that such arbitration is statutorily-mandated and public funds are at stake."); *Watt v. Roberts*, No. 112001/2009, slip op. at 6 (N.Y. Sup. Ct. 2009) ("Because the [statute] provides for mandatory arbitration of disputes regarding the terms and conditions of employment of public sector employees and prohibits such employees from withholding their services during such disputes, . . . arbitration in such circumstances is subject to broader judicial scrutiny than is applied to consensual arbitration . . . .") (unpublished decision applying statutory factors to labor arbitration involving the New York City Transit Authority). Thus, despite the Union's suggestions to the contrary, the Court's articulation of a less deferential standard of review for arbitration awards made pursuant to the Compact does not implicate a radical, *sui generis* reworking of prevailing arbitration law. The present circumstances, while somewhat unusual, are not altogether unprecedented.

## IV.

Before the Court applies the relevant standard of review to the present case, it addresses the Union's argument that to permit the Standards Act to alter the common law standard of review for arbitration awards made pursuant to the Compact would violate the Tenth Amendment to the U.S. Constitution.

Pursuant to the Tenth Amendment, the "powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend. X. Consistent with the Amendment, "Congress may not simply 'commandeer the legislative processes of the States by directly compelling them to enact and enforce a federal regulatory program.'" *New York v. United States*, 505 U.S. 144, 161 (1992)

(quoting *Hodel v. Va. Surface Mining & Reclamation Ass'n, Inc.*, 452 U.S. 264, 288 (1981)).

According to the Union, to the extent that the Standards Act mandates a judicial review that is

materially different from that which would otherwise apply to the Compact, it drastically alters

the agreement reached by Maryland, Virginia, and the District of Columbia,[18] and thereby

unconstitutionally divests them of powers that the Constitution has not transferred to the federal

government. *See Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528, 549 (1985) (noting

that the states retain sovereign authority to the extent that "the Constitution has not divested them

of their original powers and transferred those powers to the Federal Government").

The Union's Tenth Amendment challenge does not get off the starting blocks. The short

of the matter is that the Union lacks Article III standing to raise a Tenth Amendment challenge to

the Standards Act. As WMATA correctly notes, most federal circuit courts of appeals that have

considered the issue have held that private parties such as the Union lack standing to challenge

federal action as violative of the Tenth Amendment. *See, e.g.*, *United States v. Bond*, 581 F.3d

128, 137 (3d Cir. 2009); *United States v. Hacker*, 565 F.3d 522, 525-527 (8th Cir. 2009); *Oregon

v. Legal Servs. Corp.*, 552 F.3d 965, 971-72 (9th Cir. 2009); *Brooklyn Legal Servs. Corp. v.

Legal Servs. Corp.*, 462 F.3d 219, 234-35 (2d Cir. 2006); *Medeiros v. Vincent*, 431 F.3d 25, 33-

36 (1st Cir. 2005); *United States v. Parker*, 362 F.3d 1279, 1284-85 (10th Cir. 2004); *see also

Tenn. Elec. Power Co. v. Tenn. Valley Auth.*, 306 U.S. 118, 143-144 (1939) (asserting that

private utility companies did not have standing to raise a Tenth Amendment challenge); *Kennedy

v. Allera*, 612 F.3d 261, 269-70 (4th Cir. 2010) (noting, in dicta, that entertaining a Tenth

Amendment challenge by an individual would present "a serious standing question"). *But see*

---

[18] The District of Columbia, of course, is not a state, and is undoubtedly subject to Congressional control in a way
that the 50 states are not—even after the delegation of certain authority to the District's local government by the
Home Rule Act of 1973. *See Parker v. District of Columbia*, 478 F.3d 370, 408 (D.C. Cir. 2007).

*Gillespie v. City of Indianapolis*, 185 F.3d 693, 703-04 (7th Cir. 1999) (holding that an

individual had standing to raise a Tenth Amendment challenge); *Atlanta Gas Light Co. v. U.S.

Dep't of Energy*, 666 F.2d 1359, 1368 n.16 (11th Cir. 1982) (permitting, with reservations, a

private party to assert a Tenth Amendment challenge). This Court follows the majority view. As

a private, non-governmental entity, the Union lacks standing to challenge the Standards Act on

Tenth Amendment grounds.[19]

## V.

The Court applies the standard of review it has articulated to the present case.

## A.

The Supplemental Opinion, which Neutral Chairman Kasher issued on June 22, 2010,

was, like the original Award, extremely short on analysis. Although it contained brief additional

discussion of the Standards Act's statutory factors, it did not include an appropriately detailed

analysis of those factors, nor did it provide a roadmap that could take the Court to the specific

evidence the Board considered and weighed in reaching its conclusions. For example, with

respect to the Act's requirement that an arbitrator consider the "public welfare," 40 U.S.C. §

18303(b)(7), the Supplemental Opinion offered little more than Kasher's view "that both

WMATA's proposal and the [Union]'s proposal could have been fit within this standard. It is my

further opinion that the November 4, 2009 [Award] also fits within the standard." But "public

welfare" is specifically defined, *inter alia*, to comprehend "the financial ability of the individual

jurisdictions participating in the compact to pay for the costs of providing public transit services .

---

[19] As the Court noted at oral argument, the Union's constitutional argument is further hampered by the fact that the Union has not complied with Federal Rule of Civil Procedure 5.1, which requires a party challenging the constitutionality of a federal statute to notify the Attorney General of the United States and provide him with 60 days to intervene in the case. *See* Fed. R. Civ. P. 5.1. The Union failed to notify the Attorney General of its Tenth Amendment challenge in this case, and the Court was and is disinclined to pursue the issue in his absence.

. . ." 40 U.S.C. § 18303(a)(1). It is difficult to penetrate the conclusion of the Supplemental Opinion that *both* WMATA's and the Union's proposals "could have been fit within this standard." There is simply no discussion of the ability of the participating jurisdictions to finance the Award, much less an evaluation of the Act's "public welfare" components weighed against the other statutory factors.

In short, neither the original Award nor the Supplemental Opinion has given the Court a basis to determine whether the Board's decision as to wage adjustments and pension benefits is supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *See Mastro*, 270 F.3d at 176 (quoting *Richardson*, 402 U.S. at 401). Yes, the Court owes substantial deference to the Board's conclusions, but it is equally true that, as they stand, the Board's Award and Supplemental Opinion do little more than state the statutory factors, indicating in boilerplate language that they have been considered. *See Dickson*, 68 F.3d at 1405. The documents lack the "critical step [of] connecting the facts to the conclusion[s]." *See id.* Consequently, they do not demonstrate that the Board's decision is supported by substantial evidence or that it is not arbitrary or capricious. *See id.* at 1404-05.

**B.**

This has been a long voyage for the parties, and the Union's members, in particular, are surely anxious to see the Board's Award confirmed and—despite the probability of appeals to follow—to see their wages increased without further delay. But this has been a voyage in uncharted waters since, as indicated, prior to the issuance of this Opinion no court or commentator had even examined the Standards Act, much less inquired as to the specific effect of the Act on judicial review in Compact arbitration proceedings. Still, in the final analysis, the Court has had a decision to make, which it could not gloss simply because the decision might not

gratify Union members. Nor may the Court turn away from what it understands to be the law's dictates, or ignore WMATA's right to insist on a proper reading of the Act.

All this said, under the unique circumstances of the case, the Court will give the Board one *final* opportunity to issue a Supplemental Opinion, a Second one, demonstrating that it has fully complied with the strictures of the Standards Act. Mindful of the delays that consideration of the issues has already wrought, the Court will require that the Board's opinion on this second remand be issued—and that follow-on proceedings be conducted—on an expedited basis.[20]

WMATA has at various times suggested that the common law doctrine of *functus officio* bars remand of the Award to the existing Board. That argument, of course, now falls wide of the mark. As the Court has held, this is not a garden-variety case where traditional rules of judicial review apply to an arbitrator's decision. While the Standards Act speaks of "arbitration" and an "arbitrator," it establishes standards more characteristic of review of decisions by administrative agencies. The Court has concluded that a "hybrid" standard obtains. As such, the Court's decision to remand the case to the arbitral panel comports with what a reviewing court ordinarily does upon finding an administrative agency decision deficient.[21]

---

[20] Pursuant to the Standards Act, the Court "shall review the award *on the record* . . . ." 40 U.S.C. § 18304(c) (emphasis added). Generally speaking, a court reviewing an administrative tribunal's decision on the record "should have before it neither more nor less information than did the agency when it made its decision." *See IMS, P.C. v. Alvarez*, 129 F.3d 618, 623 (D.C. Cir. 1997) (internal citations and quotation marks omitted); *see also Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 743-44 (1985) ("The task of the reviewing court is to apply the appropriate APA standard of review . . . to the agency decision based on the record the agency presents to the reviewing court."). Anticipating that a more in-depth review of the Award may be necessary following submission of the Board's Second Supplemental Opinion, the Court will order that the parties submit to the Court the entire record considered in the original arbitration proceeding. WMATA's Motion to that effect [Paper No. 45] will be **GRANTED**.

[21] Even in the conventional arbitration setting, the Court would not necessarily be barred from remanding the Award for clarification of the Board's decision. Although it is true that the doctrine of *functus officio* (Latin for "a task performed") generally bars an arbitrator from revising, examining, or supplementing his award, *see Teamsters Local 312 v. Matlack*, 118 F.3d 985, 991 (3d Cir. 1997), it is also true that a district court may remand an award to an arbitration panel for clarification of the bases of an award, *see Raymond James Fin. Servs. v. Bishop*, 596 F.3d 183, 191 (4th Cir. 2010). In fact, "[r]emand to an arbitrator for clarification and interpretation is not unusual in judicial enforcement proceedings." *Id.* (quoting *McClatchy Newspapers v. Cent. Valley Typographical Union No. 46*, 686 F.2d 731, 734 n.1 (9th Cir. 1982)).

The Court understands and appreciates that the "Board" is not an administrative agency, but rather an ad-hoc coming together of three individuals, each engaged in separate professional pursuits, each with substantial personal obligations, who understandably expect to leave their involvement in the arbitration behind when they issue their Award. Undeniably, the Court's decision genuinely imposes upon the Board members. But the Standards Act says what it says. Under the Act, Board members are required to consider, analyze in some detail, and write about certain discrete issues—tasks not ordinarily found in the portfolio of arbitrators. And this they must do. The Board's Award in this case may yet be sustainable. But first the members must provide the Court with enough substance to determine whether they have in fact performed their statutory duties.

## C.

The Court will **DENY WITHOUT PREJUDICE** the parties' respective renewed motions for summary judgment and will **DIRECT** the Board to submit, within **40 DAYS**, a Second Supplemental Opinion as to those sections of the Award not previously confirmed by the Court. The Second Supplemental Opinion shall fully comply with the Standards Act's requirements for a written award, *as interpreted by the Court in this Opinion*. At a minimum, this means that the Second Supplemental Opinion shall, with respect to those sections of the Award not previously confirmed by the Court: (1) discuss each of the Standards Act's statutory factors in some detail; (2) apply each of the factors to the dispute at issue; (3) point to specific evidence in the record—by making reference to exhibits—relevant to each and every statutory factor; (4) weigh the applicable evidence pro and con; (5) state the Board's ultimate conclusions; and (6) provide a clear explanation of the reasoning behind the Board's ultimate conclusions.[22]

---

[22] In formulating its Second Supplemental Opinion, the Board shall limit its discussion and analysis to the record as it existed on November 4, 2009.

The Court will also **GRANT** WMATA's Motion for an Order Requiring the Submission of the Entire Record. The parties shall submit, within **15 DAYS**, the entire record previously presented to the Board. The parties shall provide the record in both paper and electronic formats.

Upon submission of the Second Supplemental Opinion, the parties shall have an additional **15 DAYS** to submit renewed motions for summary judgment stating their respective positions in light of the Court's construction of the Standards Act and the Board's response thereto. Each party shall then have an additional **10 DAYS** to respond to the other party's motion. To the extent that either party argues that the Board's Award should be vacated in part, the parties should brief the following issues in their renewed motions for summary judgment: (1) the extent to which the vacated provisions of a partially vacated award may be re-arbitrated while the remainder of the award is left intact; (2) whether a partially vacated award must be remanded to the same arbitration tribunal, or whether it may be remanded to a tribunal composed of new arbitrators; and (3) whether the re-arbitration of the vacated provisions of a partially vacated award must be limited to the original record, or whether the record may instead be reopened for the taking of additional evidence.

Following consideration of the parties' renewed motions for summary judgment, the Court will review the Board's Award and issue a final decision as to the Award's validity. If the Court determines that oral argument on the renewed motions for summary judgment is necessary, the Court will schedule such argument on an expedited basis.

With the parties' and the Board's cooperation, through strict adherence to an expedited briefing schedule, the Court will undertake to bring this matter to a conclusion as promptly as possible.

**VI.**

For the foregoing reasons, WMATA's Renewed Motion for Summary Judgment [Paper No. 36] is **DENIED WITHOUT PREJUDICE**. The Union's Renewed Motion for Summary Judgment [Paper No. 38] is **DENIED WITHOUT PREJUDICE**. WMATA's Motion for an Order Requiring the Submission of the Entire Record [Paper No. 45] is **GRANTED**.

A separate Order will **ISSUE**.


_____
                              /s/
                    **PETER J. MESSITTE**
          **UNITED STATES DISTRICT JUDGE**

**February 17, 2011**