## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **WASHINGTON METROPOLITAN** | * | |
| **AREA TRANSIT AUTHORITY** | * | |
| | * | |
| Petitioner | * | |
| | * | |
| v. | * | Civil No. **PJM 09-3030** |
| | * | |
| **LOCAL 689, AMALGAMATED** | * | |
| **TRANSIT UNION** | * | |
| | * | |
| Respondent | * | |

## OPINION

This action concerns the validity of an arbitration award issued by a three-person Board of Arbitration (the "Board") convened for the purpose of arbitrating a collective bargaining dispute between the Washington Metropolitan Area Transit Authority ("WMATA") and Local 689 of the Amalgamated Transit Union (the "Union"). On February 17, 2011, the Court issued an Opinion and Order, *Wash. Metro. Area Transit Auth. v. Local 689, Amalgamated Transit Union*, --- F. Supp. 2d --- (D. Md. 2011), that discussed in detail the manner in which the federal National Capital Area Interest Arbitration Standards Act ("Standards Act" or "Act"), 40 U.S.C. §§ 18301-18304, relates to the law of arbitration as it applies to certain labor disputes involving interstate compact agencies operating in the national capital area. In that Opinion and Order the Court: (1) denied the parties' then-pending cross-motions for summary judgment without prejudice; (2) directed the Board and its Neutral Chairman, Richard R. Kasher, to render a Second Supplemental Opinion demonstrating the extent to which the Board had complied with the requirements of the Standards Act as interpreted and applied by the Court; (3) ordered the parties to submit to the Court the entire record previously submitted to the Board; and (4)

directed the parties, upon review of the Board's Second Supplemental Opinion, to file renewed motions for summary judgment stating their respective positions in light of the Court's construction of the Standards Act and the Board's response thereto.

The Board has submitted its Second Supplemental Opinion, and the parties have renewed their motions for summary judgment. For the following reasons, WMATA's Second Renewed Motion for Summary Judgment and to Disqualify Board Members Kasher and Roth [Paper No. 57] is **DENIED**. The Union's Renewed Motion for Summary Judgment and to Confirm Arbitration Award [Paper No. 58] is **GRANTED**. Those portions of the Board's Interest Arbitration Opinion and Award not previously confirmed by the Court are **CONFIRMED**.

## I.

The facts and procedural background of this case were set out in detail in the Court's Opinion of February 17, 2011. That factual recitation remains operative; for present purposes, it suffices to recount only the following:

The most recent collective bargaining agreement ("CBA") between WMATA[1] and the Union[2] covered the period from May 1, 2004 through June 30, 2008. In August 2008, after negotiations over the terms and conditions of a new CBA reached an impasse, the matter proceeded to "interest arbitration"[3] before a three-person Board, as required by the Washington

---

[1] WMATA was formed in 1967 pursuant to an interstate compact among its three governing jurisdictions—the District of Columbia, the state of Maryland, and the state of Virginia. *See* D.C. Code § 9-1107.01 (adopting the compact for the District of Columbia); Md. Code Ann., Transp. § 10-204 (adopting the compact for Maryland); Va. Code. Ann. §§ 56-529, 56-530 (adopting the compact for Virginia).

[2] The Union represents some 7,700 WMATA employees, who comprise approximately 70 percent of the current WMATA workforce. WMATA bargains collectively with the Union "concerning wages, salaries, hours, working conditions, and pension or retirement provisions." Md. Code Ann., Transp. § 10-204.

[3] In this type of arbitration, the "arbitrator, instead of interpreting and applying the terms of an agreement to decide a grievance, determines what provisions the parties are to have in their collective bargaining agreement." *See* U.S. Office of Personnel Management, Labor-Management Relations Glossary, *available at* http://www.opm.gov/lmr/glossary/glossaryi.asp. In some interest arbitrations, a single neutral arbitrator or state

Metropolitan Area Transit Authority Compact (the "Compact").[4] The three-person Board

consisted of Thomas R. Roth (representing the Union), R. Theodore Clark, Jr. (a member of

WMATA's board of directors), and Richard R. Kasher (an experienced arbitrator designated to

serve as the Board's Neutral Chairman).

On November 4, 2009, after 15 days of hearings, extensive briefing, and the submission

of some 500 exhibits, the Board issued a 15-page Interest Arbitration Opinion and Award

("Award") that defined key terms and conditions of a new CBA covering the period from July 1,

2008 through June 30, 2012. Of particular relevance to the present proceeding, the Award

granted Union members the following general wage adjustments: a 2 percent lump-sum payment

effective July 1, 2008; and annual 3 percent general wage increases effective on July 1 for each

of the years 2009, 2010, and 2011. The Award declined to "increas[e] pension formulas or

chang[e] the character of the [employee pension plan] from a defined benefit plan to a plan

requiring employee contributions . . . ."

Messrs. Roth and Clark, the two partisan members of the Board, issued partially

dissenting opinions. Most relevant for present purposes, WMATA Representative Clark argued

that the Board's decision failed to comply with the Standards Act, 40 U.S.C. §§ 18301-18304,

which requires an "arbitrator rendering an arbitration award involving the employees of an

interstate compact agency operating in the national capital area" to consider certain statutorily-

imposed factors when making "a finding or a decision for inclusion in a collective bargaining

---

agency is employed to resolve a collective bargaining impasse. Charles B. Craver, *Public Sector Impasse Resolution Procedures*, 60 Chi.-Kent L. Rev. 779, 785 (1984). In others, "a tripartite arbitral panel consisting of a management representative, a labor representative, and an impartial chair [is] utilized." *Id.*

[4] When collective bargaining fails to resolve a labor dispute between WMATA and the Union, the Compact requires that the dispute be submitted "to arbitration by a board composed of three persons, one appointed by the Authority, one appointed by the labor organization representing the employees, and a third member to be agreed upon by the labor organization and the Authority." Md. Code Ann., Transp. § 10-204. In any such arbitration, the determination of a majority of the board of arbitration "shall be final and binding on all matters in dispute." *Id.*

agreement governing conditions of employment," 40 U.S.C. § 18303(b). Among the factors the

Standards Act requires an arbitrator to consider is the "public welfare," 40 U.S.C. § 18303(b)(7),

which includes "the financial ability of the individual jurisdictions participating in the compact

to pay for the costs of providing public transit services," 40 U.S.C. § 18303(a)(1). According to

Clark, the Award merely declared that the Neutral Chairman had "given full and thorough

consideration to the criteria" outlined in the Standards Act, but failed to provide any discussion

or analysis actually applying the statutory factors to the evidence in the record. This, Clark

argued, violated the Standards Act's requirement that "the arbitrator shall issue a written award

that demonstrates that all the factors set forth in [the Standards Act] have been considered and

applied." 40 U.S.C. § 18303(d)(1).

On November 5, 2009, the day after the Board handed down its Award, WMATA

announced its intention to appeal the Board's decision. A few days later, on November 9, 2009,

the Union filed its own suit in this Court, seeking to obtain confirmation and enforcement of the

Award. Then, on November 13, 2009, WMATA followed with its suit in this Court, asking the

Court to vacate the wage increase and pension benefits provisions of the Award. By Order dated

January 27, 2010, the Court consolidated the two actions.

On April 1, 2010, following oral argument on the parties' cross-motions for summary

judgment, the Court issued an Order confirming the Award except as to the provisions

addressing general wage adjustments and pension benefits. Concluding that the disputed

provisions of the Award did not demonstrate the requisite compliance with the Standards Act,

the Court remanded the case to the Board "to render a supplemental opinion within 90 days

regarding the General Wage Adjustments and Pension sections that complies with the [Standards

Act], specifically 40 U.S.C. § 18303(d)." The Court retained jurisdiction to review the

supplemental opinion and to issue a final ruling on the parties' cross-motions for summary judgment.

On June 22, 2010, the Board, through Neutral Chairman Kasher, issued an eight-page Supplemental Opinion. Although the Supplemental Opinion contained a brief additional discussion of the various statutory factors outlined in the Standards Act, like its predecessor it contained no detailed analysis of those factors, nor did it provide a roadmap that might have guided the Court to the specific evidence the Board had considered and weighed in reaching its decision.

In response to the Supplemental Opinion, the parties again filed cross-motions for summary judgment, and on August 10, 2010 the Court again heard oral argument. This time the Court deferred its final ruling to allow for consideration of three additional issues, which the parties were asked to address in supplemental briefing: (1) the historical background of interest arbitrations in labor disputes; (2) the nature of interest arbitration cases involving mass transit systems; and (3) the legislative history of the Standards Act.

After the parties submitted their supplemental briefing, the Court issued its Opinion and Order of February 17, 2011. In its Opinion, the Court articulated in considerable detail its interpretation of the Standards Act and—after determining that the Supplemental Opinion still failed to demonstrate compliance with the Act—directed the Board and Chairman Kasher to render a Second Supplemental Opinion demonstrating the extent to which the Board had complied with the requirements of the Act as interpreted and applied by the Court. The Court also denied the parties' then-pending motions for summary judgment without prejudice, ordered them to submit to the Court the entire record previously submitted to the Board, and directed them, upon review of the Second Supplemental Opinion, to file renewed motions for summary

judgment stating their respective positions in light of the Court's construction of the Standards Act and the Board's response.

The Board has submitted its Second Supplemental Opinion, and the parties have filed their renewed motions for summary judgment. The Court now issues its final ruling.

## II.

By way of background, the Court briefly revisits the Standards Act.

## A.

Ordinarily a court's review of an arbitration award is quite narrow. It may only overturn such an award under extraordinary circumstances, such as where "an award fails to draw its essence from the contract, or the award evidences a manifest disregard of the law." *MCI Constructors, LLC v. City of Greensboro*, 610 F.3d 849, 857 (4th Cir. 2010) (internal citations and quotation marks omitted). Indeed, "the scope of judicial review for an arbitrator's decision is among the narrowest known at law because to allow full scrutiny of such awards would frustrate the purpose of having arbitration at all—the quick resolution of disputes and the avoidance of the expense and delay associated with litigation." *Id.* (internal citations and quotation marks omitted).

In the present case, however, the Court is confronted with the unique language of the Standards Act, which not only imposes specific duties on "arbitrators resolving disputes involving interstate compact agencies operating in the national capital area," *see* 40 U.S.C. § 18301(b), but also imposes a specific standard for courts reviewing final awards issued by such arbitrators, *see* 40 U.S.C. § 18304(c). Specifically, the Act requires the Court to vacate an award, or any part thereof, if, among other things, "the decision by the arbitrator is arbitrary or capricious," 40 U.S.C. § 18304(c)(3), *or* if "the arbitrator did not comply with the provisions of

section 18303" of the Act, 40 U.S.C. § 18304(c)(7), which in turn requires that the arbitrator

consider several precise statutory factors and demonstrate that his conclusions regarding the

"public welfare" are supported by "substantial evidence," *see* 40 U.S.C. § 18303.

Earlier in this case, WMATA argued that the Standards Act requires the Court to "apply

the criteria developed by the courts for review of decisions under the Administrative Procedure

Act ('APA')," 5 U.S.C. § 500 *et seq.* This was so, WMATA said, because "although the

arbitration panel is not a federal agency, the text of the [Standards Act]" —particularly its

invocation of administrative law standards such as "substantial evidence" and "arbitrary or

capricious" — "clearly indicates that Congress intended that judicial review follow the basic

APA principles courts utilize to analyze agency compliance with a federal statute." The Union,

in contrast, argued that, although the factors articulated by the Standards Act should not be

"ignored," the Act could not be read to "supersede the law regarding judicial review of

arbitration awards involving WMATA" because to do so would render such awards "not final

and binding as existing arbitration statutes and law provide." The Union further maintained that

adoption of the standard urged by WMATA would be unconstitutional.[5]

Ultimately, after reviewing the language of the Standards Act and its extremely scant

legislative history, the Court, in its Opinion of February 17, 2011, concluded that the Act

imposes a complex "hybrid" of the standard of judicial review that ordinarily applies when a

court reviews the decision of an arbitration panel and that which ordinarily applies to a court's

review of the decision of an administrative agency.

---

[5] The Union argued that to permit the Standards Act to alter the common law standard of review for arbitration awards made pursuant to the Compact would violate the Tenth Amendment to the Constitution. In its Opinion of February 17, 2011, the Court concluded that the Union, a private, non-governmental entity, lacked standing to challenge the Act on Tenth Amendment grounds.

**B.**

The Court found the basic structure of the Standards Act to be as follows:

Section 18301 of the Act sets forth the "findings and purposes" justifying its enactment. Congress makes seven distinct findings, all of which relate to the economic challenges posed by increasing labor costs incurred in providing public transit in the national capital area. *See* 40 U.S.C. § 18301(a). In addition, § 18301 states that the purpose of the Act "is to adopt standards governing arbitration that *must be applied* by arbitrators resolving disputes involving interstate compact agencies operating in the national capital area *in order to lower operating costs for public transportation in the Washington metropolitan area*." 40 U.S.C. § 18301(b) (emphasis added). Thus, from the outset, the Standards Act makes pellucidly clear that it intends to compel arbitrators resolving labor disputes pursuant to the Compact both to consider and to *apply* the factors designed to meet the express goal of lowering public transportation costs in the Washington, D.C. area.

The Standards Act also establishes that an arbitrator rendering an award involving the employees of an interstate compact agency operating in the national capital area *must* consider seven specific statutory factors, *see* 40 U.S.C. § 18303(b), namely:

> (1) The existing terms and conditions of employment of the employees in the bargaining unit.
>
> (2) All available financial resources of the interstate compact agency.
>
> (3) The annual increase or decrease in consumer prices for goods and services as reflected in the most recent consumer price index for the Washington metropolitan area, published by the Bureau of Labor Statistics.
>
> (4) The wages, benefits, and terms and conditions of the employment of other employees who perform, in other jurisdictions in the Washington standard metropolitan statistical area, services similar to those in the bargaining unit.

(5) The special nature of the work performed by the employees in the bargaining unit, including any hazards or the relative ease of employment, physical requirements, educational qualifications, job training and skills, shift assignments, and the demands placed upon the employees as compared to other employees of the interstate compact agency.

(6) The interests and welfare of the employees in the bargaining unit, including—

(A) the overall compensation presently received by the employees, having regard not only for wage rates but also for wages for time not worked, including vacations, holidays, and other excused absences;

(B) all benefits received by the employees, including previous bonuses, insurance, and pensions; and

(C) the continuity and stability of employment.

(7) The public welfare.[6]

40 U.S.C. § 18303(b). This section further provides that the arbitrator "may not . . . provide for salaries and other benefits that exceed the ability of the interstate compact agency, or of any governmental jurisdiction that provides subsidy payments or budgetary assistance to the interstate compact agency, to obtain the necessary financial resources to pay for wage and benefit increases for employees of the interstate compact agency." 40 U.S.C. § 18303(c).

Certain other requirements pertain to the issuance of the arbitrator's final award. Section 18303(d)(1) provides that the arbitrator "shall issue a *written* award that demonstrates that *all* the factors set forth in [40 U.S.C. § 18303(b)-(c)] have been *considered* and *applied*." 40 U.S.C. §

---

[6] The statute defines the "public welfare" thus:

(1) the financial ability of the individual jurisdictions participating in the compact to pay for the costs of providing public transit services; and

(2) the average per capita tax burden, during the term of the collective bargaining agreement to which the arbitration relates, of the residents of the Washington metropolitan area, and the effect of an arbitration award rendered under that arbitration on the respective income or property tax rates of the jurisdictions that provide subsidy payments to the interstate compact agency established under the compact.

40 U.S.C. § 18303(a).

18303(d)(1) (emphasis added). Section 18303(d)(2) indicates that the arbitrator may grant an increase in pay or benefits "only if the arbitrator concludes that any costs to the agency do not adversely affect the public welfare." 40 U.S.C. § 18303(d)(2). Section 18303(d)(3) states that the "arbitrator's conclusion regarding the public welfare *must* be supported by *substantial evidence*." 40 U.S.C. § 18303(d)(3) (emphasis added).

Finally, the Act establishes specific requirements for judicial review of these particular arbitration awards, namely that:

> The court shall review the award *on the record*, and *shall vacate* the award *or any part of the award*, after notice and a hearing, if—
>
>> (1) the award is in violation of applicable law;
>>
>> (2) the arbitrator exceeded the arbitrator's powers;
>>
>> (3) the decision by the arbitrator is *arbitrary or capricious*;
>>
>> (4) the arbitrator conducted the hearing *contrary to the provisions of this chapter* or other laws or rules that apply to the arbitration so as to substantially prejudice the rights of a party;
>>
>> (5) there was partiality or misconduct by the arbitrator prejudicing the rights of a party;
>>
>> (6) the award was procured by corruption, fraud, or bias on the part of the arbitrator; or
>>
>> (7) the arbitrator *did not comply with the provisions of section 18303*[7] of this title.

40 U.S.C. § 18304(c) (emphasis added).

---

[7] As just discussed, § 18303: (1) refers to the seven factors the arbitrator must consider, *see* 40 U.S.C. § 18303(b)-(c); (2) requires the arbitrator to issue a written award demonstrating that all of the factors have been considered and applied, *see* 40 U.S.C. § 18303(d)(1); and (3) mandates that the arbitrator's conclusion regarding the public welfare be supported by substantial evidence, *see* 40 U.S.C. § 18303(d)(3).

## C.

The Court understands the standard of review, in cases such as this, to be as follows:

When evaluating the validity of an employment-related arbitration award issued pursuant to the Compact,[8] the court must at all times bear in mind that it must determine: (1) whether the award is *arbitrary or capricious*; (2) whether the arbitration panel properly considered and applied the Standards Act's various statutory factors in writing; and (3) whether the arbitrator's conclusions regarding the public welfare are supported by *substantial evidence*.[9] *See* 40 U.S.C. §§ 18303, 18304(c).

Although the court may not substitute its own views for those of the Compact arbitration panel, *see, e.g.*, *Mastro v. Apfel*, 270 F.3d 171, 176 (4th Cir. 2001), it nonetheless remains obliged to determine whether the panel's decision is supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," *see id.* (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). Further, while the standard of judicial review remains highly deferential, the court will not uphold a Compact arbitration panel's decision if the panel failed to consider all relevant evidence and/or failed to set forth an adequate explanation for its conclusions. *See, e.g.*, *Ohio Valley Envtl. Coalition v. Aracoma Coal Co.*, 556 F.3d 177, 192 (4th Cir. 2009) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). Indeed, when the court concludes that the Compact arbitration panel's decision has failed to satisfy this standard, the court "shall vacate the award or any part of the award, after notice and a hearing . . . ." 40 U.S.C. § 18304(c).

---

[8] The Standards Act does not apply to *all* arbitrations initiated pursuant to the Compact, but only to those which, like the present arbitration, concern "the terms and conditions of employment . . . ." 40 U.S.C. § 18302(1)(A).

[9] A reviewing court must also consider, pursuant to the Act, whether the award is in violation of some other law; whether the arbitrator otherwise exceeded his powers; whether there was partiality or misconduct by the arbitrator; and/or whether the award was procured by corruption, fraud, or bias on the part of the arbitrator. *See* 40 U.S.C. § 18304(c).

Because the Standards Act requires a Compact arbitration panel to consider explicit statutory factors, *see* 40 U.S.C. § 18303(b)-(c), it follows that the panel's written decision must do more than merely state that those factors have been considered. *See, e.g.*, *Getty v. Fed. Sav. & Loan Ins. Corp.*, 805 F.2d 1050, 1055 (D.C. Cir. 1986). Merely indicating in summary boilerplate fashion that the requisite statutory factors have been considered falls well short of demonstrating that the panel's decision is supported by substantial evidence. *See, e.g.*, *Dickson v. Sec'y of Defense*, 68 F.3d 1396, 1405 (D.C. Cir. 1995). The panel's decision must include the "critical step [of] connecting the facts to the conclusion." *See id.*

Compliance with the Standards Act requires that the panel issue a reasonably detailed written explanation of its decision that: (1) discusses each of the statutory factors; (2) applies each of the factors to the dispute at issue; (3) points to evidence in the record—making reference to specific exhibits—relevant to each and every statutory factor; (4) weighs the applicable evidence pro and con; (5) states the panel's ultimate conclusions; and (6) provides a clear explanation of the reasoning behind the panel's ultimate conclusions. If the panel's written decision fails to perform each of these six tasks, the court would be obliged to conclude, whatever may be the underlying merits of the panel's decision, that the panel has failed to articulate an adequate explanation for its conclusions. *See, e.g.*, *Ohio Valley Envtl. Coalition*, 556 F.3d at 192 (quoting *State Farm*, 463 U.S. at 43).

### III.

On March 25, 2011, Neutral Chairman Kasher, writing on behalf of a majority of the Board,[10] issued a 25-page Second Supplemental Opinion in response to the Court's Opinion and Order of February 17, 2011. Unlike the Board's previous opinions, the Second Supplemental

---

[10] Union Representative Roth joined Kasher in the majority. WMATA Representative Clark issued a dissenting opinion.

Opinion expressly invokes—and discusses—each of the Standards Act's statutory factors in some detail. The Court considers the Second Supplemental Opinion.[11]

**A.**

With respect to the first statutory factor—the "existing terms and conditions of employment of the employees in the bargaining unit," 40 U.S.C. § 18303(b)(1)—the Opinion demonstrates that the Board majority considered WMATA's position that the challenging economic environment, along with surging pension and health insurance costs, necessitated significant structural changes to the terms and conditions of the employment relationship between the parties. It also considered the Union's argument that the existing terms and conditions of employment, including wage increases and health benefits, were the product of numerous bargained-for agreements over many years,[12] and that—given the general success of those agreements over time—the basic structure of the existing terms and conditions should not be disturbed.

Ultimately, the Board concluded that, in light of rapidly rising health care costs, some structural changes to the employment relationship were appropriate. As the Opinion notes, such changes included modified "eligibility requirements for retiree health insurance and the elimination of retiree coverage for new hires."

**B.**

As for the second of the Act's statutory factors to be considered— "[a]ll available financial resources of the interstate compact agency," 40 U.S.C. § 18303(b)(2)—the Opinion

---

[11] Except where otherwise indicated, the Court will hereafter refer to the Second Supplemental Opinion as the "Opinion."

[12] On this point, the Opinion refers to Union Exhibits 33 through 45, which contain summaries of 13 collective bargaining agreements entered into by the parties—either by agreement or through interest arbitration—between 1974 and 2006. *See* Interest Arbitration R., Union Exs. 33-45.

discusses WMATA's "ability to pay" for certain proposed increases in wages and benefits. Referring to various exhibits in the record, the Opinion states that: (1) WMATA had projected an initial budget shortfall of $73 million for fiscal year 2010; (2) unlike other major transit agencies, WMATA has no dedicated source of funding; (3) for fiscal year 2009, WMATA had budgeted for the equivalent of a 3 percent "general wage increase" for Union members;[13] (4) the trustees of WMATA's employee retirement plan had adopted certain changes to plan asset valuation methods that would reduce WMATA's pension contributions by an average of $47.7 million per year from 2009 through 2012; and (5) the 2008-2009 "Great Recession" had had an adverse effect on the local and national economies.

The Opinion goes on to state that the Board majority concluded, in light of the considerations noted above, that WMATA could not absorb the wage and benefit increases proposed by the Union,[14] which would have resulted in labor cost increases of approximately 7.6 percent per year. The Board chose instead to adopt wages and benefits changes that would result in labor cost increases of approximately 1.76 percent per year, consisting of an average annual wage increase of less than 3 percent and certain offsetting reductions in WMATA's health and welfare plan. The Opinion recognizes that WMATA's "available resources" are not unlimited, but nevertheless concludes that wage increases averaging less than 3 percent per year are not beyond its reach. In reaching this conclusion, it gives particular weight to evidence that WMATA had budgeted for significant wage increases in fiscal year 2009.

---

[13] Evidence in the record suggests that WMATA's budgeted increases in Union headcount for fiscal year 2009 resulted in projected labor cost increases that were equivalent to a general wage increase of well over 3 percent. *See* Interest Arbitration R., Union Ex. 164, at 2.

[14] The Union's proposal called for wage increases of 6 percent per year, plus cost of living increases. *See* Interest Arbitration R., Union Ex. 1, at 1. WMATA's proposal called for 1 percent lump-sum payments for 2008 and 2009, and annual wage increases of 1 percent in 2010 and 2011. *See* Interest Arbitration R., WMATA Ex. 3A, at 1-2.

## C.

The third statutory factor is "[t]he annual increase or decrease in consumer prices for goods and services as reflected in the most recent consumer price index for the Washington metropolitan area, published by the Bureau of Labor Statistics," 40 U.S.C. § 18303(b)(3). Here the Opinion observes that, for the twelve months ending in May 2009, the consumer price index for the "Washington-Baltimore area" had declined by 0.6 percent.[15] It notes, however, that there was evidence of an uptick in inflation in the first half of 2009,[16] and that real pay had decreased since the last collective bargaining agreement. Thus, as stated in the Opinion, a majority of the Board concluded that some increase in wages was necessary to maintain "real pay" over the four-year term of the next collective bargaining agreement.

## D.

As for the fourth statutory factor— "[t]he wages, benefits, and terms and conditions of the employment of other employees who perform, in other jurisdictions in the Washington standard metropolitan statistical area, services similar to those in the bargaining unit," 40 U.S.C. § 18303(b)(4)—the Opinion dedicates more than four pages to a discussion of how the Union members' wages and benefits compare to those of other transit workers in the Washington metropolitan area. The Board majority's discussion begins with a summary of several factual assertions and arguments advanced by WMATA—namely, that the hourly wages of WMATA's bus operators are as much as 26.5 percent higher than those of bus drivers working for other transit agencies in the area; that, in general, the wages of Union members are anywhere from 13

---

[15] WMATA's post-hearing brief cited evidence of declining prices in the twelve months ending in May 2009. *See* Interest Arbitration R., WMATA's Post-Hearing Brief, at 14.

[16] The Union's post-hearing brief cited evidence of rising inflation and a decline in real wages for Washington-area transit workers between 2004 and 2008. *See* Interest Arbitration R., Union's Post-Hearing Brief, at 16.

percent to 80 percent higher than those of employees of other transit agencies in the area; and that, given these wage premiums and the poor fiscal conditions of the Compact jurisdictions, significant annual wage increases for Union employees could not be justified.[17]

The Opinion then goes on to discuss the Union's position. Although the Union effectively conceded that its members' wages are higher than those of other transit workers in the Washington area, it argued that the comparison was inapt because, in the Union's view, none of the other transit agencies in the area provides services that necessitate the "mix of occupations" and skillsets that the operation of WMATA requires.[18] In support of its position, the Union asserted that over half of its members occupy jobs dedicated to rail operations, and that no other transit agency in the Compact jurisdictions[19] performs rail-related services. The Union also maintained that some 36 percent of its members work as skilled mechanics, and that such workers are difficult to recruit in the Washington labor market, which is uniquely characterized by government, white-collar, and service industry jobs. The Union also objected to WMATA's reliance on data reflecting, at least in part, wages and benefits for workers in Baltimore and other

---

[17] On these points, the Opinion refers to a report prepared by Michael Wachter, a professor of law and economics at the University of Pennsylvania. According to Professor Wachter's report, WMATA's workers, when compared to other transit workers in the Washington area, enjoy wage premiums of 26.5 percent (bus operators), 6.2 percent (mechanics), 60 percent (mechanic helpers), 46 percent (janitors and cleaners), 26 percent (laborers), 80 percent (division clerks and related personnel), 19 percent (accounting and payroll clerks), and 13 percent (customer service personnel). *See* Interest Arbitration R., WMATA Ex. 137, at 19-26. The Opinion also refers to an exhibit showing that WMATA's top hourly workers earn an average hourly rate of $27.98, whereas the top hourly workers at other transit agencies in the Washington area average $22.12 per hour. *See* Interest Arbitration R., WMATA Ex. 23.

[18] The Opinion cites a 2007 media release in which WMATA blamed a rise in overtime hours on difficulties in hiring "station managers, train operators, bus drivers, and specialized mechanics." *See* Interest Arbitration R., Union Ex. 191. It also cites a WMATA memorandum proposing wage increases for certain highly skilled escalator and elevator technicians. *See* Interest Arbitration R., Union Ex. 151.

[19] The Compact defines the area in which WMATA operates—the "Washington Metropolitan Area Transit Zone"—as: "[T]he District of Columbia, the cities of Alexandria, Falls Church, and Fairfax, and the counties of Arlington, Fairfax, and Loudoun and political subdivisions of the Commonwealth of Virginia located within those counties, and the counties of Montgomery and Prince George's in the State of Maryland and political subdivisions of the State of Maryland located in said counties." Md. Code Ann., Transp. § 10-204.

areas beyond the "Washington standard metropolitan statistical area."[20] It further claimed that

WMATA's statistical comparisons relied on classifications that covered only 1,056—

approximately 14 percent—of the Union's members.

Ultimately, the Opinion concludes that the wage differential between WMATA

employees and other public transit workers in the area is justified. In reaching this conclusion,

the Board majority found that: (1) the wage data offered by WMATA did not provide reliable

comparisons with other transit workers in the area, since WMATA's data were both over-

inclusive (insofar as they included wage data for employees outside of the "Washington standard

metropolitan statistical area") and under-inclusive (insofar as the labor classifications WMATA

used covered only a fraction of the Union's members); (2) the other transit agencies in the

Washington area are much smaller in scale and complexity as compared to WMATA;[21] (3)

WMATA's transportation system is more than twice as productive as the area's smaller transit

agencies;[22] (4) WMATA's "central city" bus system requires much more arduous work than the

bus systems in the surrounding suburban areas; and (5) WMATA generally does not compete

with the local suburban transit agencies for labor.[23] Having made these findings, the Board

---

[20] Evidence cited in the Opinion demonstrates that the combined statistical area from which at least some of WMATA's data were derived includes jurisdictions—e.g., Baltimore, Maryland; Harford County, Maryland; Carroll County, Maryland; etc.—in which WMATA does not operate. *See* Interest Arbitration R., WMATA Ex. 20, at 3.

[21] Evidence cited in the Opinion shows that WMATA operates more than 1,200 vehicles in "maximum service," and that it employs more than 3,200 bus operators, whereas the *combined* transit agencies in the surrounding counties operate less than 700 vehicles and employ fewer than 1,500 bus drivers. *See* Interest Arbitration R., Union Ex. 170.

[22] On this point, the Opinion refers to statistics showing that WMATA scores considerably higher than the suburban transit agencies with respect to various productivity metrics, including passenger miles per revenue mile, passenger miles per vehicle operator, passenger miles per employee hour worked, vehicle revenue miles per vehicle operator, operating expense per passenger mile, and labor cost per passenger mile. *See* Interest Arbitration R., Union Ex. 171, at 2-7.

[23] The Opinion cites a Union exhibit which states that only five of the last 90 bus operators hired by WMATA came from other transit agencies in the surrounding counties. *See* Interest Arbitration R., Union Ex. 172.

essentially concluded that a wage differential between WMATA employees and transit employees in the outlying suburban areas is warranted.

**E.**

The fifth of the Act's statutory factors addresses "[t]he special nature of the work performed by the employees in the bargaining unit, including any hazards or the relative ease of employment, physical requirements, educational qualifications, job training and skills, shift assignments, and the demands placed upon the employees as compared to other employees of the interstate compact agency," 40 U.S.C. § 18303(b)(5). While the Opinion contains relatively little discussion directly addressing this factor, much of the discussion pertaining to the fourth and sixth statutory factors—which includes comparisons between Union employees and other employees inside and outside of WMATA—also applies to this factor. Additionally, citing several Union exhibits,[24] the Opinion ultimately concludes that: "[E]vidence established that a substantial number of WMATA's employees possessed significantly greater job qualifications, that many of these employees faced greater job hazards, particularly those working in the rail side of WMATA's operations, and faced greater demands in terms of job responsibilities because of their work in inter-city operations."

**F.**

The sixth statutory factor concerns "[t]he interests and welfare of the employees in the bargaining unit, including . . . the overall compensation presently received by the employees . . . ; all benefits received by the employees . . . ; and the continuity and stability of employment," 40

---

[24] *See, e.g.*, Interest Arbitration R., Union Ex. 17 (showing that urban transit system workers incur occupational injuries and illnesses at a rate much higher than the private industry average); *id.* at Union Ex. 20, at 6 (article stating that "bus drivers have higher rates of mortality, morbidity, and absence due to illness when compared to employees from a wide range of other occupational groups"); *id.* at Union Ex. 32 (describing crimes on WMATA property and vehicles from 2001 to 2007).

U.S.C. § 18303(b)(6). Addressing this factor, the Opinion first summarizes WMATA's position, which was essentially that the wages, pension benefits, and health benefits enjoyed by Union members are superior to those received by employees of the other transit agencies in the Washington area,[25] and that WMATA's health care costs, as a percentage of total compensation, are, at 15.2 percent, nearly twice the national average.

The Opinion then summarizes the Union's position, which was essentially that the wages and benefits offered to Union members are lower than those of other union-represented and non-union WMATA employees. In support of this assertion, the Union cited a compensation analysis stating, among other things, that fiscal year 2008 average total compensation for Union employees was $82,076, whereas other union-represented WMATA employees and other non-union WMATA employees earned, on average, $99,109 and $105,991, respectively.[26] The Union also maintained that health plan costs for Union members have increased at a lower rate as compared to health plan costs for other union-represented and non-union WMATA employees.

Ultimately, after weighing the arguments of the parties, the Opinion concludes that "some reduction in WMATA's health and welfare obligations was justified." These reductions, the Opinion states, were outlined in detail in the original Award.

## G.

Pursuant to the seventh, and last, of the Act's statutory factors, the Board was required to consider "[t]he public welfare,"[27] 40 U.S.C. § 18303(b)(7). The Opinion begins its discussion of

---

[25] The Opinion cites, among other exhibits, a report demonstrating that the value of WMATA's employee health plan exceeds the values of the plans offered by the other public transit agencies in the Washington area. *See* Interest Arbitration R., WMATA Ex. 57, at 13-24.

[26] *See* Interest Arbitration R., Union Ex. 108, at 1.

[27] As noted *supra*, the Standards Act's definition of the "public welfare" is:

this factor by summarizing WMATA's position that, in light of the challenging economic

climate, the Compact jurisdictions do not have the fiscal capacity to increase their subsidies for

WMATA—especially since the jurisdictions have frozen wages for their own employees and

have made significant cuts in various important public services, including public transportation

services.[28] The Opinion then summarizes the Union's position, which was essentially that the

wage increases it proposed—6 percent per year, plus cost of living increases—would have a

negligible effect on the tax burdens, tax rates, or general fiscal health of the Compact

jurisdictions. On this point, the Opinion cites a Union exhibit showing that each jurisdiction's

share of the proposed 6 percent wage increases would constitute well under one-half of 1 percent

of each jurisdiction's budget for fiscal year 2009.[29]

       The Board majority considered the evidence and arguments presented by the parties and

ultimately agreed that the Compact jurisdictions could not absorb the wage increases proposed

by the Union, which would have cost approximately $355 million over the course of the three-

---

    (1) the financial ability of the individual jurisdictions participating in the compact to pay for the
costs of providing public transit services; and

    (2) the average per capita tax burden, during the term of the collective bargaining agreement to
which the arbitration relates, of the residents of the Washington metropolitan area, and the effect
of an arbitration award rendered under that arbitration on the respective income or property tax
rates of the jurisdictions that provide subsidy payments to the interstate compact agency
established under the compact.

40 U.S.C. § 18303(a).

[28] The Opinion cites various exhibits introduced by WMATA. *See* Interest Arbitration R., WMATA Ex. 205, at 18
(describing various fiscal challenges and transportation service cuts in Maryland); *id.* at WMATA Ex. 207, at 18-20
(describing budget deficits in the Compact jurisdictions); *id.* at WMATA Ex. 208, at 20-23 (describing budget
deficits in the Compact jurisdictions); *id.* at WMATA Ex. 209 (articles and other documents describing budgetary
challenges in the Compact jurisdictions); *id.* at WMATA Ex. 210 (articles describing pay cuts, layoffs, service cuts,
and spending reductions in the Compact jurisdictions).

[29] *See* Interest Arbitration R., Union Ex. 166, at 3 (showing that, as allocated across the jurisdictions, the Union's
proposed 6 percent wage increases would amount to 0.046 percent of the budget for the District of Columbia, 0.015
percent for the state of Maryland, 0.006 percent for the state of Virginia, 0.027 percent for the city of Alexandria,
0.001 percent for Arlington County, and 0.014 percent for Fairfax County).

year bargaining agreement term that the Union proposed, resulting in a labor cost increase of

some 7.6 percent per year. Citing the challenging economic environment and the fiscal

conditions of the Compact jurisdictions, the Opinion states that the Board chose instead to award

more modest wage increases totaling $107 million over a four-year contract term—a labor cost

increase of approximately 1.76 percent per year. The Board concluded that the cost increases it

awarded could be funded, at least in part, by fare increases, which, in the Board majority's view,

"would have no potential effect on the public welfare as defined by the Act . . . ."[30]

## H.

The Opinion wraps up with a discussion of the WMATA employees' pension plan. Here,

the Board majority states that it "gave similar consideration and weight to each of the

factors/criteria listed in the [Act] as it did in determining the appropriate level of wages." The

Opinion also states that, with respect to the pension plan, the Board concluded that maintenance

of the status quo—i.e., its decision not to increase pension formulas or change the character of

the plan from a defined benefit plan to a plan requiring employee contributions—was appropriate

for several reasons: (1) the plan's current underfunded status was largely the result of WMATA's

decision—apparently made against the recommendation of its chief financial officer[31]—to cease

making contributions to the plan over an eight-year period; (2) the trustees of the plan had

adopted certain changes to plan asset valuation methods that would reduce WMATA's pension

---

[30] The Act's definition of the "public welfare," *see* 40 U.S.C. § 18303(a), does not reference fares or fare increases. However, as noted earlier, an express purpose of the Act is to "to lower operating costs for public transportation in the Washington metropolitan area," 40 U.S.C. § 18301(b), and, in turn, to control "the prices charged for mass transit services," *see* 40 U.S.C. § 18301(a)(2). The Act also states that "higher operating costs incurred for public transit in the national capital area cannot be offset by increasing costs to patrons, since this often discourages ridership and thus undermines the public interest in promoting the use of public transit." 40 U.S.C. § 18301(a)(4).

[31] The Opinion cites the testimony of former WMATA chief financial officer ("CFO") Peter Benjamin, who stated that he did not agree with WMATA's decision to cease making contributions to the pension plan. *See* Interest Arbitration R., Arbitration Hr'g Tr. 2480-81. Benjamin was WMATA's CFO when the decision to halt contributions was made. *See id.*

contributions by some $190.8 million over the four-year term of the new collective bargaining agreement; (3) maintaining the status quo would not, in the Board majority's view, "directly impact subsidies paid by the supporting jurisdictions, nor would the maintenance of the status quo necessarily increase tax rates or tax burdens"; and (4) any burden flowing from the maintenance of the status quo would be offset, at least in part, by savings from the health and welfare plan adjustments promulgated as part of the Award.

## I.

While the foregoing reflects the rationale of a majority of the Board, the positions of Messrs. Roth and Kasher, respectively in concurrence and dissent, must be noted. In a brief concurrence, Union Representative Roth states that he "join[s] the Chairman in both the Award and majority opinion on the wage and pension issues." He indicates that, in reaching his decision to join Neutral Chairman Kasher, the "absence of concessionary change in the pension area weighed heavily in [his] decision to concur on the wage subject."

In a much lengthier dissent, WMATA Representative Clark takes issue with several aspects of the majority Opinion. He argues that it: (1) ignores the Standards Act's stated purpose of "lower[ing] operating costs for public transportation in the Washington metropolitan area," *see* 40 U.S.C. § 18301(b); (2) never clearly states or concludes that the provisions of the Award will not adversely affect the public welfare; (3) fails to show that any conclusions regarding the public welfare are supported by substantial evidence; (4) makes conclusory statements that are supported by little more than summaries of the parties' arguments; and (5) consistently ignores relevant evidence.

**IV.**

The parties have renewed their motions for summary judgment in light of the Court's construction of the Standards Act and the Second Supplemental Opinion. WMATA, reiterating the position of Board member Clark, urges that the wage increase and pension benefits provisions of the Award be vacated because the Opinion fails to show that the Board, in reaching its conclusions, complied with the Standards Act as interpreted by the Court. As expected, the Union argues that the most recent Opinion demonstrates full compliance with the Act, and that the wage increase and pension benefits provisions of the Award must therefore be confirmed. Along the way, the parties cross swords with respect to certain private communications Neutral Chairman Kasher and Union Representative Roth apparently had during the drafting of the Opinion.

**A.**

In the 44-page brief it filed in support of its Second Renewed Motion for Summary Judgment and to Disqualify Board Members Kasher and Roth, WMATA argues that the Opinion does not demonstrate compliance with the Standards Act, and that the Court must therefore vacate the unconfirmed provisions of the Award. Although lengthy, WMATA's arguments boil down to the following:

(1) Rather than weighing the evidence and properly applying the Act's seven statutory factors, the Opinion merely summarizes the parties' positions, then states in conclusory fashion the Board majority's ultimate decision on each particular factor;

(2) The Opinion fails to adequately explain the Board majority's reasoning, and thus lacks the critical step of connecting the facts to the Board's conclusions;

(3) The Opinion misapplies several of the statutory factors, most notably the fourth factor,[32] which, in WMATA's view, requires a direct comparison between the wages and benefits of WMATA employees and those of other local transit agency workers whose services were erroneously deemed too "dissimilar" by the Board;

(4) The Opinion ignores relevant record evidence, including evidence showing that: (a) WMATA's fares are already among the highest in the nation;[33] (b) WMATA's budgeted wage increase estimates for fiscal year 2009—on which the Opinion substantially relies—were made in the fall of 2007, well before the emergence of the economic crisis;[34] and (c) despite the pension plan trustees' adoption of certain changes to plan asset valuation methods, WMATA will still incur increased pension funding obligations totaling approximately $158 million during the term of the Award[35];

(5) The Opinion ignores Congressional intent by adopting, in defiance of the Act, the "standard approach employed in most interest arbitrations," i.e., that "the party seeking significant structural change in certain terms and conditions in a collective bargaining agreement must be able to prove that there are special circumstances or intervening events that warrant such change";

---

[32] The fourth statutory factor concerns "[t]he wages, benefits, and terms and conditions of the employment of other employees who perform, in other jurisdictions in the Washington standard metropolitan statistical area, services similar to those in the bargaining unit," 40 U.S.C. § 18303(b)(4).

[33] *See* Interest Arbitration R., Arbitration Hr'g Tr. 2306-07 (testimony of Carol Dillon Kissal, WMATA's current CFO).

[34] *See* Interest Arbitration R., Arbitration Hr'g Tr. 2312-16 (testimony of WMATA CFO Kissal).

[35] *See* Interest Arbitration R., WMATA Ex. 83, at Ex. 1 (showing increasing pension plan contributions over the term of the Award).

(6) The Opinion ignores the Act's express goal of lowering public transportation costs in the Washington, D.C. area, particularly insofar as it concludes that the Award's wage increases and pension benefits could be funded, at least in part, by fare increases;

(7) The Opinion fails to affirmatively and expressly conclude that the Award will not "adversely affect the public welfare," as required by the Act;

(8) To the extent that the Opinion can be interpreted as concluding that the Award will not "adversely affect the public welfare," it fails to support such a conclusion with "substantial evidence"—especially when one considers that the Board ignored evidence showing that WMATA's fares are already among the highest in the nation; and

(9) The Opinion wholly ignores, indeed does not even cite, § 18303(c) of the Act, which prohibits an award of "salaries and other benefits that exceed the ability of [WMATA or the Compact jurisdictions] to obtain the necessary financial resources to pay for wage and benefit increases for employees of the interstate compact agency," 40 U.S.C. § 18303(c).

**B.**

The Union argues that the Opinion complies fully with the strictures of the Standards Act because it: contains substantive discussion of each of the seven statutory factors; explains the reasoning behind the Board's decisions; and specifically ties the Board's reasoning to record evidence. All of this, the Union maintains, demonstrates that the Board's decisions were in no way arbitrary or capricious, and that its conclusions regarding the public welfare were adequately supported by substantial evidence.

The Union also submits that WMATA's position cuts far too deeply. In effect, according to the Union, WMATA is maintaining that the Standards Act operates as a flat prohibition against *any* increases in wages or benefits. Given the difficult economic climate, no increases can

be justified since they necessarily lie beyond the ability of the Compact jurisdictions, taxpayers, and patrons to pay. But this standard, says the Union, renders the statutory factors entirely superfluous, since no amount of consideration of particular factors could ever overcome the stakeholders' supposed inability to pay.

Finally, the Union argues that WMATA unfairly ignores the fact that the wage increase and pension benefits[36] provisions of the Award would be offset, at least in part, by reductions in the cost of WMATA's employee health and welfare plan. In the Union's view, analyzing the Award's wage increases alone, without taking into account changes to the health and welfare plan that favor WMATA, results in a skewed view of the Award's overall impact on employee compensation. Indeed, the Union maintains that, when the health and welfare plan changes are considered, it is not even clear that the Award would serve to increase Union member compensation *at all*—much less in any significant, deleterious way.

## C.

As to the parties' clash over the effect of certain private communications between Neutral Chairman Kasher and Union Representative Roth during the drafting of the Opinion, the record shows that:

On March 2, 2011, responding to the Court's Opinion and Order of February 17, 2011, Kasher sent a letter to Roth and Clark, indicating that he "interpret[ed] the Court's Order as seeking a collaborative effort by the Board members." He thus invited Roth and Clark to submit, by March 12, 2011, "proposed language consistent with the Court's Order," which he would then consider in drafting the Second Supplemental Opinion.

---

[36] The Union also argues that, because the Award makes no changes to the employee pension plan, its decision vis-à-vis pension benefits is effectively not governed by the Standards Act, which, in the Union's view, applies only to decisions to *increase* wages and/or benefits—and *not* to decisions to merely maintain the status quo. WMATA disagrees with that interpretation of the Act.

Sometime after he received Kasher's letter of March 2, 2011, Roth telephoned Kasher—without Clark's consent or knowledge—and requested that he be permitted to submit his comments in private, i.e., without sharing them with Clark.[37] Kasher agreed.

On March 11, 2011, Clark, apparently unaware of the telephone conversation between Roth and Kasher, sent his comments in accordance with Kasher's request, along with a copy to Roth. In his letter, Clark opined that the wage increase and pension benefits provisions of the Award could not be squared with the Standards Act, and that, absent the Board's willingness to reconsider those provisions, he (Clark) was "unable to join [Kasher] in drafting a Second Supplemental Opinion . . . ."

A few days later, on March 15, 2011, Clark realized that he had not yet received a copy of Roth's comments and e-mailed Roth to request a copy. Roth responded that same day, informing Clark that he had asked Kasher if he could submit his comments in private, and that Kasher had agreed. Roth also wrote to Clark:

> I understand your position regarding wages and pensions, which, as a practical matter, makes it impossible for you to contribute to an opinion which supports the majority Award on those issues. I see no purpose, therefore, in communicating directly with you on the content of an opinion which is intended to conform to Judge Messitte's Order. I understand that in supporting your client's legal position you would prefer that Arbitrator Kasher fail in his intended mission to meet the court's Order for a Second Supplemental Opinion that is consistent with the Act's requirements as interpreted by the Court.

E-mail Message from Thomas R. Roth to R. Theodore Clark, Jr. (Mar. 15, 2011) [Paper No. 57, Ex. D].

---

[37] In making his request, Roth reminded Kasher that, on prior occasions during the arbitration, the parties, orally, had unanimously agreed to permit private communications between Kasher and either of the partisan members of the Board. WMATA acknowledges that such private communications were agreed to and in fact occurred in the past, but argues that the communications occurred pursuant to unanimous agreement among the parties, and only in the context of settlement negotiations—*not* where the Board was engaged in formal decision-making or opinion drafting. However, WMATA has not pointed to any document showing that the agreement was to apply only to certain phases of the proceedings, and both Kasher and Roth dispute that that was ever the understanding.

Clark subsequently sent two letters to Kasher, in which he requested a copy of Roth's comments. Kasher never responded to those letters. On March 25, 2011, Kasher issued the Board's Opinion. Five days later, on March 30, 2011, Roth and Clark issued concurring and dissenting opinions respectively.

In WMATA's view, the communications between Roth and Kasher deprived it of due process with the result that the unconfirmed provisions of the Award must be vacated. The Union takes the position that Roth's exchanges with Kasher were analogous to the private exchanges that often take place between two judges on a three-judge appellate panel, especially where those two judges comprise the majority against a third dissenting judge.[38] The Union also argues that ultimately there was no harm in Roth's communications with Kasher—since Clark eventually had an untrammeled opportunity to review Kasher's opinion and issue a dissent, just as Roth had an opportunity to review Kasher's opinion and issue a concurrence. The Union further argues that the Court has no power—whether under the Standards Act or some other authority—to "disqualify" members of the Board.

To be clear, WMATA does not allege that any member of the Board engaged in improper communications with a person who was not a member of the three-person Board. It maintains only that two members of the arbitration panel (Roth and Kasher) engaged in certain private communications without sharing the contents of those communications with the third panel member (Clark).[39]

---

[38] WMATA maintains that this analogy lacks merit, in part because Roth was permitted to serve as an advocate and fact witness for the Union in the underlying arbitration proceedings. On the other hand, WMATA concedes that the majority Opinion neither cites nor relies on any evidence not already of record in the case, whether supplied by Roth or anyone else.

[39] WMATA insists on referring to the private exchanges between Roth and Kasher as "*ex parte* communications." The Court declines to accept that characterization. Properly understood, *ex parte* communications occur between "an adversary party [and] a decision-maker in an adjudicatory proceeding," *see Thompson v. Greene*, 427 F.3d 263, 269 n.7 (4th Cir. 2005).

## V.

After careful review of the Second Supplemental Opinion, the record evidence, and the arguments presented in the parties' renewed motions for summary judgment, the Court concludes that the Opinion demonstrates—albeit not by a particularly wide margin—the requisite compliance with the Standards Act, and that, accordingly, those provisions of the Award not previously confirmed by the Court should be confirmed. The Court also concludes that the private communications between Neutral Chairman Kasher and Union Representative Roth were neither improper nor did they prejudice WMATA in a way that might call for vacatur of the Award and/or the disqualification of Kasher or Roth.

## A.

To repeat, in its Opinion and Order of February 17, 2011, the Court held that, when evaluating the validity of an employment-related arbitration award issued pursuant to the Compact, a court must determine: (1) whether the award is *arbitrary or capricious*; (2) whether the arbitration panel properly considered and applied, in writing, the Standards Act's various statutory factors; and (3) whether the arbitrator's conclusions regarding the public welfare are supported by *substantial evidence*. *See* 40 U.S.C. §§ 18303, 18304(c). The Court also held that compliance with the Standards Act ordinarily requires that the arbitration panel issue a detailed written explanation of its decision that, at a minimum: (1) discusses each of the statutory factors in some detail; (2) applies each of the factors to the dispute at issue; (3) points to specific evidence in the record—by making reference to exhibits—relevant to each and every statutory factor; (4) weighs the applicable evidence pro and con; (5) states the panel's ultimate conclusions; and (6) provides a clear explanation of the reasoning behind the panel's ultimate conclusions.

Notwithstanding these requirements, the Court's review of a Compact arbitration panel's award remains highly deferential. Again, the standard that the Court articulated in its Opinion and Order of February 17, 2011 is of a "hybrid" nature—it incorporates elements of both the exceptionally narrow standard that ordinarily applies when a court reviews the decision of an arbitration panel and the somewhat broader—but still highly deferential—standard that ordinarily applies to a court's review of the decision of an administrative agency. The Court's task is not to "re-weigh conflicting evidence, make credibility determinations, or substitute its [own] judgment" for that of the arbitration panel, *see Mastro*, 270 F.3d at 176, but rather to determine whether there is a mere "rational connection between the facts found and the choice made," *see Dickson*, 68 F.3d at 1404. An arbitration panel's decision is presumed valid, *see Ohio Valley Envtl. Coalition*, 556 F.3d at 192, and need not be "a model of analytic precision to survive a challenge," *see Dickson*, 68 F.3d at 1404.[40] To be sure, although an arbitration panel's conclusions regarding the public welfare, which are reviewed under a substantial evidence standard, must be supported by "more than a mere scintilla of evidence," the amount of evidence required is still "somewhat less than a preponderance." *See Mastro*, 270 F.3d at 176.

The Board's Opinion, even if not "a model of analytic precision," *Dickson*, 68 F.3d at 1404, satisfies the Court that the Board's conclusions were rational based on the evidence in the record. The Opinion discusses each of the seven statutory factors in some detail, links those factors to the employment dispute between the parties, points to evidence in the record, considers evidence in support of the parties' respective positions, states its conclusions (if not as explicitly

---

[40] Given that the Court has interpreted the Standards Act as imposing a "hybrid" standard of review that incorporates elements of the standard a court ordinarily applies to review of an administrative agency decision *and* the more deferential standard a court applies to review of an arbitration award, the presumption of validity applied to the Board's conclusions is more deferential than that which would apply in the administrative law setting.

as the Court might have, still explicitly enough), and provides explanations for the conclusions it

reaches.

Even the Board's most disputed conclusions—e.g., that the wage increases awarded

would not adversely affect the public welfare,[41] and that the services performed by WMATA

employees have no true counterpart elsewhere in the Washington metropolitan area—are

supported by more than a "mere scintilla of evidence." *See Mastro*, 270 F.3d at 176. With respect

to the wage increases, the Opinion cites evidence showing that WMATA had previously

budgeted for labor cost increases in excess of those awarded,[42] and that each jurisdiction's share

of the wage increases awarded would constitute less than one-half of 1 percent of each

jurisdiction's budget for fiscal year 2009.[43] While unquestionably there was evidence pointing in

the other direction,[44] the evidence cited by the Board majority was substantial enough that "a

reasonable mind might accept [it] as adequate to support a conclusion." *See Mastro*, 270 F.3d at

176. The same is true of the evidence cited in support of the Board's conclusions regarding

comparisons between the Union's members and other transit employees in the Washington

---

[41] The Court does not accept WMATA's argument that the Opinion fails to affirmatively and expressly conclude that the Award will not "adversely affect the public welfare," *see* 40 U.S.C. § 18303(d)(2). While it is true that the Opinion does not state its ultimate conclusion regarding the public welfare in those exact words, it does make plain—particularly in its discussion of the seventh statutory factor—that the Board majority found that the public welfare would not be harmed by the Award. Specifically, the Opinion states that the "Board concluded that reasonable wage increases would be affordable," and that "the cost of the Award would [not] cause an increase in subsidies, tax rates, or burdens." Viewed in their context, and in light of the Standards Act's definition of the public welfare, *see* 40 U.S.C. § 18303(a), these statements amount to a conclusion that the Award will not "adversely affect the public welfare." For essentially the same reasons, the Court also rejects WMATA's argument that the Opinion is deficient because it ignores § 18303(c) of the Act, which prohibits an award of "salaries and other benefits that exceed the ability of [WMATA or the Compact jurisdictions] to obtain the necessary financial resources to pay for wage and benefit increases for employees of the interstate compact agency," 40 U.S.C. § 18303(c). The statements from the Opinion already quoted demonstrate that the Board concluded that the Award did not exceed WMATA's— or the Compact jurisdictions'—ability to pay.

[42] *See supra* note 13.

[43] *See supra* note 29.

[44] *See supra* note 28.

metropolitan area, which includes exhibits suggesting, among other things, that other transit agencies in the Washington area are smaller in scale and complexity as compared to WMATA,[45] and that WMATA's transportation system is considerably more productive than the area's smaller transit agencies.[46] Thus the evidence is of a nature that "a reasonable mind might accept."

WMATA's brief in support of its Second Renewed Motion for Summary Judgment effectively invites the Court to consider the record *de novo* and reach its own conclusions in place of those made by the Board. But what WMATA's brief does not satisfactorily explain is why a "reasonable mind" could not have arrived at the conclusions the Board reached. WMATA appears to misapprehend the task that faces the Court, namely to determine only: (1) whether the Standards Act's requirements for a written award have been met; and (2) if those requirements have been met, whether the written award is supported by evidence that a reasonable person might accept in support of the conclusions reached. The Court may not substitute its own opinion—or that of WMATA, for that matter—for the Opinion of the Board.

WMATA also fails to explain how—in light of its characterization of the dire economic situation facing the parties in 2009—its *own* original proposal would have passed muster under its current reading of the evidence. As the Union points out, the thrust of WMATA's latest position is that virtually *any* wage increase would adversely affect the public welfare. And yet WMATA itself proposed 1 percent lump-sum payments for 2008 and 2009, along with annual wage increases of 1 percent in 2010 and 2011. *See* Interest Arbitration R., WMATA Ex. 3A, at 1-2. If there is an exhibit in the record that might somehow establish the precise point at which a

---

[45] *See supra* note 21.

[46] *See supra* note 22.

proposed compensation increase tips from being affordable to having an adverse effect on the public welfare—presumably, in WMATA's view, somewhere between a 1 percent increase and a 3 percent increase in wages—neither party has brought it to the Court's attention. The Court would note again that the Opinion shows that the Board in fact rejected as unaffordable the Union's proposed wage increases of 6 percent per year (plus cost of living adjustments), *see* Interest Arbitration R., Union Ex. 1, at 1, and opted instead for increases that it *did* deem affordable—increases which fell between the Union's proposal and that of WMATA.

That said, the Court is given pause by the Opinion's rather casual reference to fare increases as a possible source of funding for the awarded wage increases, since an express purpose of the Standards Act is "to lower operating costs for public transportation in the Washington metropolitan area," 40 U.S.C. § 18301(b), and, in turn, to control "the prices charged for mass transit services," *see* 40 U.S.C. § 18301(a)(2). The Act also states that "higher operating costs incurred for public transit in the national capital area cannot be offset by increasing costs to patrons, since this often discourages ridership and thus undermines the public interest in promoting the use of public transit." 40 U.S.C. § 18301(a)(4). The question, however, is whether the Board majority's casual reference to the possibility of fare increases is enough to sink the entire Opinion. The Court thinks not.

The Court regards the Opinion's references to fare increases as much like *obiter dicta*—they appear in the Opinion, to be sure, but they are not really central to its conclusions. All projected funding sources cited by the Board must to a considerable extent be speculative, since it can never be posited with certainty in advance precisely how much each of the Compact jurisdictions will contribute to WMATA's budget. Those contributions will always be a function of what level of services the jurisdictions (and their constituents) demand, and what they are

prepared to pay for. The Court, after its overall review, is satisfied that the projected funding sources for the Board's wage Award—*other than* fare increases—are just as likely to be sufficient to cover the Award as they would be *with* the inclusion of fare increases. That is enough, in the Court's view, to neutralize any suggestion that fare increases would in fact be necessary.[47]

For these reasons, the Court concludes that the Board majority's Award, as explained and justified in its Opinion, accords with the Standards Act. Whatever its flaws, the Opinion shows that: the Award is not "arbitrary or capricious," 40 U.S.C. § 18304(c)(3); the Board considered and applied the Standards Act's numerous statutory factors, *see* 40 U.S.C. § 18303(d)(1); the Board concluded that the Award would not "adversely affect the public welfare," 40 U.S.C. § 18303(d)(2); and the Board's conclusions regarding the public welfare are supported by evidence *substantial* enough such that a "reasonable mind" might accept it as adequate to support the conclusions reached, *see* 40 U.S.C. § 18303(d)(3); *Mastro*, 270 F.3d at 176. In consequence, absent a showing that the Board's decision-making process was irretrievably tainted by some procedural irregularity, the Court is disposed to confirm the Award in its entirety.

---

[47] Although external events should ordinarily have no bearing on the Court's analysis or its decision as to the ultimate validity of the Award, recent events suggest that WMATA may in fact be able to absorb the awarded wage increases without significantly raising fares or cutting services. As noted in a recent press article, WMATA recently announced that it has approved its budget for 2012, and that the budget does *not* include "any major rail fare increases" or significant service cutbacks. *See* Dana Hedgpeth, *Metro Board of Directors Approves $2.5 Billion Budget*, Wash. Post, June 24, 2011, at B5. The article notes that an initial budget shortfall for 2012 was resolved through larger contributions from the Compact jurisdictions, internal cost savings, and changes to certain bus routes. *See id.* In addition, a WMATA board member is quoted as saying, "The fact that we were able to get through the year with operating results that were $30 million better than expected shows me we're managing the place well." *Id.*

**B.**

There remains, in this regard, the parties' dispute over the private communications between Neutral Chairman Kasher and Union Representative Roth.[48]

As WMATA has pointed out, courts have vacated arbitration awards after concluding that *ex parte* communications between an arbitrator and a witness or party so infected the proceedings as to prejudice the rights of a party. *See Star Boxing, Inc. v. DaimlerChrysler Motors Corp.*, 840 N.Y.S.2d 357, 358 (N.Y. App. Div. 2007) (holding that *ex parte* communications between an arbitrator and a party's representative violated a statute and therefore necessitated vacatur of an arbitration award); *Rosenthal-Collins Group, L.P. v. Reiff*, 748 N.E.2d 229, 235 (Ill. App. Ct. 2001) (affirming a trial court's decision to vacate an arbitration award tainted by *ex parte* communications between a party and a member of a panel of arbitrators). In addition, the Standards Act requires vacatur of a Compact arbitration award where "there was partiality or misconduct by the arbitrator prejudicing the rights of a party." 40 U.S.C. § 18304(c)(5). Citing these and other authorities, WMATA argues that the private communications between Kasher and Roth deprived it of due process such that the Court must vacate the unconfirmed provisions of the Award. The Court disagrees.

---

[48] On July 6, 2011, the Court held a teleconference with counsel, on the record, for the purpose of discussing the private communications between Roth and Kasher. All three members of the Board also participated. During the teleconference, the Union took the position that court-ordered disclosure of the communications would constitute an inappropriate interference with the interest arbitration process. WMATA, on the other hand, argued that this case could not fairly proceed unless and until it was able to review Roth's communications. The Court offered to review the communications *in camera*—so as to determine their possible relevance without first requiring their disclosure to WMATA. *Cf. United States v. Abu Ali*, 528 F.3d 210, 245 (4th Cir. 2008) (quoting *Abourezk v. Reagan*, 785 F.2d 1043, 1060 (D.C. Cir. 1986)) (noting that, when an evidentiary privilege is asserted, the Court has the discretion to test the validity of the privilege "by *in camera* and *ex parte* proceedings . . . 'for the limited purpose of determining whether the asserted privilege is genuinely applicable'"). The Union indicated a willingness to provide the communications for *in camera* review by the Court; WMATA, however, refused to consent to such review. Under these circumstances, the Court chose to proceed without conducting an *in camera* review and without compelling disclosure of the communications to WMATA.

It may well be that Neutral Chairman Kasher acted unwisely in permitting Union Representative Roth to submit certain correspondence without copying WMATA Representative Clark. Vacatur of the Award and/or disqualification of Kasher or Roth is another matter altogether. As noted in footnote 39, *supra*, the Court does not accept WMATA's repeated efforts to characterize the communications at issue as *ex parte* communications, since the communications occurred not between a member of the Board and a party or witness, but rather between two members of a three-person arbitration panel, much as two judges on a three-judge appellate panel might have conversations without involving the third judge.[49] Additionally, and more importantly, the Court concludes that WMATA suffered no prejudice as a result of the communications—especially since Clark, WMATA's representative on the Board, told Kasher and Roth in no uncertain terms that, unless the Board were willing to *reconsider* the wage increase and pension benefits provisions of the Award, he would be "unable to join [Kasher] in drafting a Second Supplemental Opinion . . . ."[50] When the Court remanded this case in its

---

[49] As the Union points out, Justices of the United States Supreme Court sometimes confer with other Justices in private—to the exclusion of other members of the nine-Justice Court. For instance, during deliberations leading up to the Court's decision in *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833 (1992), Justices O'Connor, Kennedy, and Souter conferred privately regarding the drafting of a plurality opinion, and the fact of their conference was not disclosed to the other Justices until after their opinion was drafted and circulated. *See* Jeffrey Toobin, The Nine: Inside the Secret World of the Supreme Court 57-65 (Anchor Books 2008) (2007); Edward Lazarus, Closed Chambers: The Rise, Fall, and Future of the Modern Supreme Court 469-473 (Penguin Books 2005) (1998).

[50] In his March 11, 2011 comments to Kasher, Clark wrote:

> [T]he Board's wage and pension award cannot be justified under the Standards Act. In order to facilitate this Board's compliance with the Standards Act, I urge our reconsideration of the Award pertaining to General Wage Adjustments and Pensions. If you and Member Roth are amenable to reconsideration of the unconfirmed portions of the Award pertaining to General Wage Adjustments and Pensions, I would welcome the opportunity to reconvene the Board for further deliberations and to work with you both in fashioning an award as to wages and pensions that, based on the record evidence, complies with the Standards Act.

> If the Board is unwilling to alter its wage and pension award, so as to comply with the Standards Act, then *I am simply unable to join you in drafting a Second Supplemental Opinion to support the portions of the Award pertaining to General Wage Adjustments and Pensions. Assuming the*

Opinion and Order of February 17, 2011, it instructed the Board to issue a Second Supplemental Opinion clarifying its decisions and explaining its reasons in a manner that would permit the Court to determine whether the Board had complied with the Standards Act. Plainly the Court did *not* invite the Board to re-arbitrate the case and/or alter the substance of its decisions; the Court said only that the Board's first two submissions had not provided it with "a basis to determine *whether* the Board's decision as to wage adjustments and pension benefits [was] supported by 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Until the present Opinion, the Court had in no way opined as to the *substance* of the Award.[51]

Given the limited purpose of the remand, and given WMATA Representative Clark's declared unwillingness to participate in the drafting of the Opinion, the Court is unable to see how the outcome might have been different had the private communications between Kasher and Roth not occurred. Clearly, from the beginning Kasher and Roth have taken the position that they properly considered and applied the factors that the Act required them to consider. Equally clearly, from the beginning Clark has taken the position that the Board did *not* properly consider those factors. To a virtual certainty, then, the outcome would have been the same with or without

---

*Board elects not to alter its wage and pension award, I respectfully request the opportunity and hereby reserve my right to file a dissent.*

Letter from R. Theodore Clark, Jr. to Richard R. Kasher (Mar. 11, 2011) [Paper No. 57, Ex. E] (emphasis added). Clark's written statement to Kasher strongly implies that he had little or nothing to contribute to the Opinion.

[51] In its Opinion of February 17, 2011, the Court said: "The Board's Award in this case *may yet be sustainable*. But first the members must provide the Court with enough substance to determine *whether* they have in fact performed their statutory duties" (emphasis added). This language—along with other sections of the Court's Opinion—is entirely at odds with WMATA's apparent interpretation of the Court's Opinion and Order as an invitation to revise the Award's substance.

the private communications; there would have been a majority Opinion authored by Kasher and

Roth, and a vigorous dissent by Clark.[52]

     The Court concludes that the private communications in this case had no impact on the

outcome and did not prejudice WMATA. *See* 40 U.S.C. § 18304(c)(5) (requiring vacatur of a

Compact arbitration award where "there was partiality or misconduct by the arbitrator

*prejudicing the rights of a party*") (emphasis added). Since the private communications between

Kasher and Roth do not alter the Court's ultimate conclusion that the Award, as clarified in the

Second Supplemental Opinion, meets the requirements of the Standards Act, the Award must

now be confirmed in its entirety.

## VI.

     Summing up, WMATA's Second Renewed Motion for Summary Judgment and to

Disqualify Board Members Kasher and Roth [Paper No. 57] is **DENIED**. The Union's Renewed

Motion for Summary Judgment and to Confirm Arbitration Award [Paper No. 58] is

**GRANTED**. Those portions of the Board's Interest Arbitration Opinion and Award not

previously confirmed by the Court are **CONFIRMED**.

     A separate Order will **ISSUE**.

_____/s/_____
**PETER J. MESSITTE**
**UNITED STATES DISTRICT JUDGE**

**July 22, 2011**

---

[52] As a final note, the Court emphasizes that, even in the context of the Standards Act, a court's authority to interfere with an arbitral decision remains limited. *See, e.g.*, *Major League Baseball Players Ass'n v. Garvey*, 532 U.S. 504, 509 (2001) (noting that judicial authority to interfere with labor-arbitration decisions is "very limited"). In view of that, and given WMATA's inability to articulate precisely how the Roth-Kasher communications might have prejudiced it in some substantive way, the Court fails to see how requiring the disclosure of the communications would be appropriate. In a sense, WMATA seeks to have its cake and eat it too. It argues that the Roth-Kasher communications infected the drafting of the Board's Opinion in some significant, harmful way. On the other hand, it refuses to consent to the Court's offer to review the communications *in camera* to see if they were in fact as harmful as WMATA says they were.